102 Cal.Rptr.2d 280 (2000)
24 Cal.4th 693
13 P.3d 1122
EAST BAY ASIAN LOCAL DEVELOPMENT CORPORATION et al., Plaintiffs and Respondents,
v.
The STATE of California, Defendant and Appellant.
No. S077396.
Supreme Court of California.
December 21, 2000.
*283 Daniel E. Lungren and Bill Lockyer, Attorneys General, Roderick E. Walston and Richard M. Frank, Chief Assistant Attorneys General, Carole R. Kornblum, Assistant Attorney General, Louis Verdugo, Jr., Kelvin C. Gong and Kathleen W. Mikkelson, Deputy Attorneys General, for Defendant and Appellant.
Tobin & Tobin, Paul E. Gaspari and Lawrence R. Jannuzzi, San Francisco, for the American Baptist Churches of the West, the Armenian Apostolic Orthodox Church, California Catholic Conference, the California Council of Churches, the California/Nevada Conference of the United Methodist Church, General Conference of the Seventh-Day Adventist Church, Christian Science Committee on Publication for Northern California, Federation of Zoroastrian Associations of North America, Pacific Southwest Region, Christian Church (Disciples of Christ), San Francisco Association of Evangelical Churches, the San Francisco Interfaith Council, Sierra Pacific Synod of the Evangelical Lutheran Church in America, Southern California West Synod of the Evangelical Lutheran Church in America, Synod of Southern California and Hawaii, Presbyterian Church (USA), Synod of the Pacific of the Presbyterian Church (USA), Western Diocese of the American Church of North America, the Church of the Brethren, Congregation Beth Israel, San Diego, the Episcopal Diocese of California, the Episcopal Diocese of Los Angeles, Pomona First Baptist Church, the Roman Catholic Diocese of Monterey, the Rev. Judith Gonsales, Native American Church, St. John Serbian Orthodox Church and the United Church of Christ as Amici Curiae on behalf of Defendant and Appellant.
Sidley & Austin, Jeffrey A. Berman, James M. Harris, Los Angeles, Gene C. Schaerr, John E. Fee, Washington, Dist. of Columbia; Law Offices of Steven Drapkin and Steven Drapkin, Los Angeles, for Pacific Union Conference of Seventh-Day Adventists, Loma Linda University, Loma Linda University Medical Center, Adventist Health, National Council of the Churches of Christ in the U.S.A., National Association of Evangelicals, Christian Legal Society, Seventh-Day Adventist Church State Council, Council on Religious Freedom, California Council of Churches, Interfaith Religious Liberty Foundation, Traditional Values Coalition, Capitol Resource Institute and Baptist Joint Committee on Public Affairs as Amici Curiae on behalf of Defendant and Appellant.
Morrison & Foerster, Zane O. Gresham, J. Edgar Pew, Olive L. Thaler and William M. Fleishhacker, San Francisco, for Plaintiffs and Respondents East Bay Asian Local Development Corporation, the Foundation for San Francisco's Architectural Heritage, the Los Angeles Conservancy, California Preservation Foundation, California Planning and Conservation League, California Chapter American Planning Association, National Alliance of Preservation Commissions and National Trust for Historic Preservation of the United States.
Louise H. Renne, City Attorney, Dennis Aftergut, Chief Assistant City Attorney, *284 Kate H. Stacy and Ellen Forman, Deputy City Attorneys, for Plaintiff and Respondent City and County of San Francisco.
Burke, Weaver & Prell, Susan L. Trevarthen and Nancy E. Stroud, Boca Raton, FL, for American Planning Association as Amicus Curiae on behalf of Plaintiffs and Respondents.
Margaret C. Crosby; Howard, Rice, Nemerovski, Canady, Falk & Rabkin, Ethan P. Schulman and Simon J. Frankel, San Francisco, for American Civil Liberties Union Foundation of Northern California, Inc., as Amicus Curiae on behalf of Plaintiffs and Respondents.
Oliver, Vose, Sandifer, Murphy & Lee, Bradley E. Wohlenberg and Arthur J. Hazarabedian, Los Angeles, for 29 California Cities as Amici Curiae on behalf of Plaintiffs and Respondents.
BAXTER, J.
This case presents issues arising under the establishment clause of the First Amendment to the United States Constitution,[1] and under article I, section 4[2] and article XVI, section 5 of the California Constitution. The question on which review was granted asks: Does a state law granting religiously affiliated organizations the authority to declare themselves exempt from historic preservation laws violate the establishment clause of the United States Constitution or any of the California Constitution religion clauses? The question arises in the context of a facial challenge to Government Code sections 25373 and 37361,[3] which have the effect of granting an exemption from landmark preservation laws to noncommercial property owned by a religious organization that objects to landmark designation and determines in a public forum that the organization would suffer a substantial hardship if the property were designated a historic landmark.
The Court of Appeal found no constitutional infirmity in the law. It concluded that the establishment clause found in article I, section 4 of the California Constitution did not afford broader protection than the First Amendment. It then held that the state may act to reduce an actual or perceived burden on the religious freedom of persons within its jurisdiction, particularly where the state has imposed that burden. The court reasoned that the exemption does not endorse religion. It simply facilitates the efforts of religious organizations to advance their own purposes. The ability of religious organizations to use their property to advance their purposes is no greater by virtue of the grant of an exemption than it was before the landmark preservation law was imposed on them. The law simply restores their ability to use noncommercial property, unencumbered by the restrictions that accompany landmark designation. Thus, the exemption does not provide governmental assistance to religious organizations in carrying out their religious mission. By providing the exemption the state simply stepped out of the way of the religious property owner.
The Court of Appeal also rejected plaintiffs' claim that the exemption violated that part of the free exercise clause of article I, section 4 of the California Constitution (article I, section 4) that guarantees free exercise without "preference." The court reasoned that the dispute concerned only the establishment clause and that, in any event, the free exercise clause of article I, section 4 does not afford greater protection *285 of religious freedom than does the First Amendment to the United States Constitution (First Amendment).
We agree. We conclude that sections 25373 and 37361 are not facially invalid under the establishment clause of article I, section 4 or the First Amendment. We also conclude that the exemption created by those provisions does not violate the nopreference provision of article I, section 4, or article XVI, section 5 of the California Constitution (article XVI, section 5).
We shall, therefore, affirm the judgment of the Court of Appeal.

I

Background.
Plaintiffs, one secular nonprofit community economic development organization that owns properties designated as or eligible for designation as landmark sites, several nonprofit organizations interested in the preservation of historic landmarks in California, and the City and County of San Francisco, initiated this action seeking injunctive and declaratory relief on the ground that sections 25373 and 37361 are facially invalid to the extent that these laws grant noncommercial property owned by religious organizations an exemption from historic landmark designation and regulation. The trial court agreed and granted summary judgment in favor of plaintiffs, declaring that the law violated both the state and the federal establishment clauses and was an unconstitutional delegation of governmental power to private entities. The court therefore enjoined enforcement of the exemption provisions. The Court of Appeal reversed.
The Court of Appeal reasoned that if the landmark preservation law significantly interfered with the ability of religious organizations to freely exercise their religion, the exemption might be constitutionally permissible to alleviate the burden of that interference. (Corporation of Presiding Bishop v. Amos (1987) 483 U.S. 327, 335, 107 S.Ct. 2862, 97 L.Ed.2d 273.) It concluded, however, that it did not have to decide if a significant interference resulted from application of the landmark preservation law, reasoning that even if it determined that there was no burden on the free exercise of religion, the issue would not be resolved since the "limits of permissible state accommodation to religion are by no means co-extensive with the noninterference mandated by the Free Exercise Clause." (Walz v. Tax Commission (1970) 397 U.S. 664, 673, 90 S.Ct. 1409, 25 L.Ed.2d 697 (Walz); see also Corporation of Presiding Bishop v. Amos, supra, 483 U.S. at p. 334, 107 S.Ct. 2862.) After reviewing recent First Amendment decisions of the United States Supreme Court, which it believed were not controlling, the Court of Appeal concluded that actual interference with free exercise was not a constitutional prerequisite to a valid legislatively created exemption to accommodate religion. Relying in part on Rowe v. Superior Court (1993) 15 Cal.App.4th 1711, 1731-1732, 19 Cal.Rptr.2d 625, it held that the Legislature may act to alleviate a burden that rationally can be perceived as posing a significant deterrent to the free exercise of religion, and that "given uncertainty over whether local historic preservation laws adopted pursuant to sections 25373 and 37361 would impinge upon the free exercise rights of religious entities, the state could rationally conclude action was necessary to avert a free exercise claim." The court acknowledged that its conclusion differed from the conclusion reached in Duffy v. State Personnel Board (1991) 232 Cal.App.3d 1, 12, 283 Cal.Rptr. 622, where the court had held that before governmental action may be perceived as a permissible accommodation of religion, the action must lift an identifiable burden on free exercise.
The Court of Appeal held that the nopreference provision of the California free exercise clause did not create a standard that is more protective than the First Amendment establishment clause. It also *286 rejected plaintiffs' article XVI, section 5 argument.
This court granted plaintiffs' petition for review to consider whether the exemption violates the establishment clause of either the federal or state Constitution or any other clause of the state Constitution related to religion.[4]

II

Questions to be Addressed.
Plaintiffs' challenge to the validity of the exemption provisions of sections 25373 and 37361 is based primarily on an argument that permitting religious entities to exempt their noncommercial properties from landmark preservation laws violates the establishment clauses of the First Amendment and both the free exercise/no preference and the establishment clauses of article I, section 4.
The State of California, defending the constitutional validity of the statutes, contends that the exemption does not violate the free exercise/no preference clause of article I, section 4. The exemption is necessary because landmark status imposes a substantial burden on religious entities' free exercise of religion. And, in any event, the exemption is permissible because the Legislature could reasonably believe that historical landmark status would burden free exercise of religion by religious entities owning such properties. Therefore, the state argues, a legislative decision to grant an accommodating exemption does not violate either the state or federal establishment clause or the state free exercise/no preference clause.
Before addressing the questions thus posed, we outline the state law that gives rise to this case, and, to put the arguments in context, the provisions of a typical landmark preservation ordinance.

A. The State Landmark Preservation Enabling Legislation.
Section 25373, enacted in 1963 (Stats. 1963, ch. 987, § 1, p. 2249) and section 37361, first enacted in 1957 (Stats.1957, ch. 864, § 1, p.2078) and amended in 1959 (Stats.1959, ch.2015, § 1, p. 4655) apply to county and city government, respectively. Each grants authority to acquire historic landmarks for the purpose of preserving and/or developing the property. Each also grants authority to "provide special conditions or regulations for the protection, enhancement, perpetuation, or use of places, sites, building, structures, works of art, and other objects having a special character or special historical or aesthetic interest or value." (§ 25373; see § 37361 [substantially similar].) These special conditions and regulations may include appropriate and reasonable control of the appearance of neighboring private property within public view. (§§ 25373, subd. (b); 37361, subd. (b).) The State Office of Historic Preservation advises that as of 1994, when a preservation survey was conducted, of the 356 jurisdictions that responded, 15 counties had enacted landmark preservation ordinances, the first of which were those enacted by Sacramento and Ventura Counties in 1966. One hundred twentytwo cities had enacted such ordinances, 17 of which were enacted in 1960.
The exemption at issue here, found in subdivision (d) of section 25373, and subdivision *287 (c) of section 37361, was added as a temporary measure in 1993 (Stats.1993, ch. 419, §§ 1, 2, pp. 2378-2379.) It was made permanent in 1994 with the passage of Assembly Bill No. 133 (1993-1994 Reg. Sess.). (Stats.1994, ch. 1199, §§ 1, 2.)
Sections 25373 and 37361 provide in pertinent part: "Subdivision (b) shall not apply to noncommercial property owned by any association or corporation that is religiously affiliated and not organized for private profit, whether the corporation is organized as a religious corporation, or as a public benefit corporation, provided that both of the following occur:
"(1) The association or corporation objects to the application of the subdivision to its property.
"(2) The association or corporation determines in a public forum that it will suffer substantial hardship, which is likely to deprive the association or corporation of economic return on its property, the reasonable use of its property, or the appropriate use of its property in the furtherance of its religious mission, if the application is approved." (§§ 25373, subd. (d), 37361, subd. (c).)
An explanation of the purpose of the exemption subdivisions was included in Senate Bill No. 1185 (1993-1994 Reg. Sess.), the 1993 legislation, and in Assembly Bill No. 133 (1993-1994 Reg. Sess.), the 1994 bill (hereafter Assembly Bill No. 133), each of which, after noting that historic landmark restrictions were not related to or compelled by public health or safety concerns, stated: "Sections 1 and 2 of this act ensure the protection of religious freedom guaranteed by Section 4 of Article I of the California Constitution and by the First Amendment to the United States Constitution." (Stats. 1993, ch. 419, § 7, p. 2388; see Stats.1994, ch. 1199, § 3 [substantially identical].)
These Government Code provisions, as is apparent, do not themselves exempt any property from any landmark preservation ordinance. Instead, they prohibit application of any local landmark preservation law to property owned by a religious entity that satisfies the statutory criteria through which the owner may exempt its noncommercial property. Since the purpose and effect of the law is to create an exemption, however, we refer to and analyze these provisions as exemptions.

B. Local Landmark Preservation Laws.
The burden or perceived burden that the designation of noncommercial property owned by a religious organization as a landmark imposes on the owner's free exercise of religion cannot be assessed in a vacuum. In this facial attack on sections 25373 and 37361, we have no evidence of the actual impact of any landmark preservation ordinance as applied to any property. However, plaintiffs' complaint alleged that article 10 of the San Francisco Planning Code, enacted in 1967, is a representative example of local landmark preservation legislation and has been made part of the record in this matter. The state did not dispute that characterization of the ordinance. We shall, therefore, assume that the San Francisco Planning Code is typical and look to it in assessing whether the restrictions imposed by typical local landmark preservation legislation on their face either imposed a burden or, if the Court of Appeal was correct in its enunciation of the test, reasonably may be perceived as imposing a burden on free exercise of religion.
Under section 1004, subdivision (a) of the San Francisco Planning Code, after specified procedural requirements have been complied with, which include a hearing at which the owner may appear, the board of supervisors, by ordinance, may "designate an individual structure or other feature or an integrated group of structures and features on a single lot or site, having a special character or special historical, architectural or aesthetic interest or value, as a landmark. . . ." Under that *288 section the board may also "designate an area containing a number of structures having a special character or special historical, architectural or aesthetic interest or value, and constituting a distinct section of the city, as a historic district." (Ibid.)
Section 1005, subdivision (a) of the San Francisco Planning Code provides: "No person shall carry out or cause to be carried out on a designated landmark site or in a designated historic district any construction, alteration, removal or demolition of a structure or any work involving a sign, awning, marquee, canopy, mural, or other appendage, for which a City permit is required, except in conformity with the provisions of this Article 10." No permits are to be issued except in conformity with the ordinance, and, in a historic district, "any or all exterior changes visible from a public street or other public place shall require approval in accordance with the provisions of this Article 10, regardless of whether or not a City permit is required for such exterior changes. Such exterior changes may include, but shall not be limited to, painting and repainting; landscaping; fencing; and installation of lighting fixtures and other building appendages." (Id., subd. (c)(1).) Unless the proposed work is for ordinary maintenance and repair to correct deterioration, decay, or damage, a "Certificate of Appropriateness" is required for exterior changes, construction, alteration, removal or demolition, and for exterior work of the type described in a historic district. (Id., § 1006.)
If the city planning commission concludes that a proposed structural alteration or exterior change "would have a significant impact upon, or is potentially detrimental to, the landmark site or historical district, or upon request of the Planning Commission, the Planning Commission shall hold a public hearing on the application." (S.F. Planning Code, § 1006.2, subd. (a)(2).) If the proposed work involves construction or alteration of a landmark, or involves an "appendage" (sign, awning, etc.) or exterior change in a historic district, the commission must approve or disapprove the application in whole or in part. (Id., § 1006.6, subd. (a).) In deciding whether to grant a certificate of appropriateness, the reviewing agencies must consider "architectural style, design, arrangement, texture, materials, color, and any other pertinent factors." (Id., § 1006.7.) If the application is for a landmark site, "the proposed work shall preserve, enhance or restore, and shall not damage or destroy, the exterior architectural features of the landmark. . . . The proposed work shall not adversely affect the special character or special historical, architectural or aesthetic interest or value of the landmark and its site, as viewed both in themselves and in their setting, nor of the historic district in applicable cases." (Id., § 1006.7, subd. (b).) Misdemeanor penalties of a fine not exceeding $500 and/or imprisonment up to six months is provided for violations of the ordinance, with a new offense committed for each day a violation is committed or permitted to continue. (Id., § 1013, subd. (d).)
If removal or demolition of a structure is proposed, the commission may suspend action on an application for six months, and, for good cause shown, the board of supervisors may extend that suspension for an additional six months. (S.F. Planning Code, § 1006.6, subd. (b).) Thus, the landmark controls may preclude an otherwise permissible removal or destruction of a structure for up to one year. During that period the planning commission is authorized to take steps necessary to preserve the structure and may seek public or private purchase of the structure or removal to another site. (Id., § 1006.6, subd. (d).)
Additional provisions govern the granting of a certificate of appropriateness for structures within several areas of San Francisco that have been designated as historic districts. (See S.F. Planning Code, §§ 1006.2-1006.6; see also id., art 10, appens. B-K.)

*289 III

Does the Exemption from Landmark Restrictions Violate Either the First Amendment or Article I, Section 4?

A. First Amendment Establishment Clause.
Plaintiffs contend that sections 25373 and 37361 violate the establishment clause of the First Amendment by conferring a benefit on religious organizations that is not extended to nonreligious entities that own noncommercial property that has been designated a landmark. The Supreme Court has repeatedly recognized, however, that "not every law that confers an `indirect,' `remote,' or `incidental' benefit upon religious institutions is, for that reason alone, constitutionally invalid. [Citations.] What our cases require is careful examination of any law challenged on establishment grounds with a view to ascertaining whether it furthers any of the evils against which that Clause protects. Primary among those evils have been `sponsorship, financial support, and active involvement of the sovereign in religious activity.' Walz v. Tax Comm'n, supra, at 668[, 90 S.Ct. 1409]; Lemon v. Kurtzman [(1971) 403 U.S. 602,] 612[, 91 S.Ct. 2105, 29 L.Ed.2d 745]." (Committee for Public Education v. Nyquist (1973) 413 U.S. 756, 771-772, 93 S.Ct. 2955, 37 L.Ed.2d 948.)
In Walz, supra, 397 U.S. at page 669, 90 S.Ct. 1409, the court had elaborated on the nature of those evils and the difficulty the court has experienced in developing the jurisprudence of the establishment and free exercise clauses:
"The course of constitutional neutrality in this area cannot be an absolutely straight line; rigidity could well defeat the basic purposes of those provisions, which is to insure that no religion be sponsored or favored, none commanded, and none inhibited. The general principle deducible from the First Amendment and all that has been said by the Court is this: that we will not tolerate either governmentally established religion or governmental interference with religion. Short of those expressly proscribed governmental acts there is room for play in the joints productive of a benevolent neutrality which will permit religious exercise to exist without sponsorship and without interference.
"Each value judgment under the Religion Clauses must therefore turn on whether particular acts in question are intended to establish or interfere with religious beliefs and practices or have the effect of doing so. Adherence to the policy of neutrality that derives from an accommodation of the Establishment and Free Exercise Clauses had prevented the kind of involvement that would tip the balance toward government control of churches or governmental restraint on religious practice." (Walz, supra, 397 U.S. at pp. 669-670, 90 S.Ct. 1409.)
Building on Walz and earlier cases, in Lemon v. Kurtzman, supra, 403 U.S. 602, 91 S.Ct. 2105 (Lemon), the court developed an analytical framework under which a statute challenged under the establishment clause should be examined to assess whether the conduct is constitutionally forbidden. "Every analysis in this area must begin with consideration of the cumulative criteria developed by the Court over many years. Three such tests may be gleaned from our cases. First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion, Board of Education v. Allen, 392 U.S. 236, 243, 88 S.Ct. 1923, 20 L.Ed.2d 1060 (1968); finally, the statute must not foster `an excessive government entanglement with religion.' Walz, supra, at 674, 90 S.Ct. 1409." (Lemon, supra, 403 U.S. at pp. 612-613, 91 S.Ct. 2105.) Collectively, these are the three prongs of the "Lemon test."
Although, as the Court of Appeal noted here, the Lemon test, which derives in part from Walz, is ill-suited to evaluating an establishment clause challenge to a law that creates an exemption for religious bodies from a neutral law of general application, *290 the high court has not yet modified the test to accommodate such exemptions. In Corporation of Presiding Bishop v. Amos, supra, 483 U.S. 327, 107 S.Ct. 2862, 97 L.Ed.2d 273, the Supreme Court applied the Lemon test and, concluding that the law challenged there satisfied that test, found it unnecessary to decide if a different standard should apply when a religious exemption was challenged under the establishment clause. The question there was whether an exemption of a religious organization's secular, nonprofit activities from title VII of the Civil Rights Act of 1964's prohibition of employment discrimination on the basis of religion (42 U.S.C. § 2000e et seq.) violated the establishment clause of the First Amendment. The Supreme Court examined the impact on religious exercise both of the law from which exemption was authorized and, applying the Lemon test, of the exemption itself. (42 U.S.C. § 2000e-1(a).) Before doing so, the court set out the establishment clause principles under which the validity of the exemption was to be determined: "`This Court has long recognized that the government may (and sometimes must) accommodate religious practices and that it may do so without violating the Establishment Clause.' Hobbie v. Unemployment Appeals Comm'n of Fla., 480 U.S. 136, 144-145[, 107 S.Ct. 1046, 94 L.Ed.2d 190] (1987) (footnote omitted). It is well established, too, that `[t]he limits of permissible state accommodation to religion are by no means co-extensive with the noninterference mandated by the Free Exercise Clause.' Walz v. Tax Comm'n, [supra,] 397 U.S. 664, 673[, 90 S.Ct. 1409, 25 L.Ed.2d 697]. There is ample room under the Establishment Clause for `benevolent neutrality which will permit religious exercise to exist without sponsorship and without interference.' Id., at 669[, 90 S.Ct. 1409]. At some point, accommodation may devolve into `an unlawful fostering of religion.' Hobbie, supra, at 145,[ 107 S.Ct. 1046] but these are not such cases, in our view." (Corporation of Presiding Bishop v. Amos, supra, 483 U.S. at pp. 334-335, 107 S.Ct. 2862.)
The court then applied the Lemon test to the exemption and, in doing so, considered the impact of the exemption from the nondiscrimination provision of title VII. The first prong of that test, that the law have a secular purpose, was met even though the exemption benefited only religious organizations. The court explained that having a secular purpose does not require that the purpose of the challenged law be unrelated to religion. The secular purpose test is aimed at preserving governmental neutrality in religious matters. "Under the Lemon analysis, it is a permissible legislative purpose to alleviate significant governmental interference with the ability of religious organizations to define and carry out their religious missions." (Corporation of Presiding Bishop v. Amos, supra, 483 U.S. at p. 335, 107 S.Ct. 2862.) The court next examined the impact of the law to which the exemption applied and concluded that, notwithstanding a prior limited exclusion for religious activities, the title VII ban on discrimination continued to impose a significant burden on religious organizations by requiring them to predict, on pain of serious sanctions if they were wrong, which of their activities a court would deem to be religious. (483 U.S. at pp. 335-336, 107 S.Ct. 2862.)
Addressing the second prong of the Lemon testthat the law have a "principal or primary effect . . . that neither advances nor inhibits religion" (Lemon, supra, 403 U.S. at p. 612, 91 S.Ct. 2105)the court pointed out that a law that permits a church to advance religion is not unconstitutional. Only if the government promotes religion through its own activities or influence is there a forbidden effect. The record did not suggest that the exemption gave the church any greater ability to propagate its religious message that it had before it was subjected to the nondiscrimination in hiring provisions of title VII. Therefore the government did not, by enacting the exemption, itself advance religion. *291 The benefit religious institutions gained, as against other employers subject to title VII, was not a basis for invalidating the exemption. "Where . . . government acts with the proper purpose of lifting a regulation that burdens the exercise of religion, we see no reason to require that the exemption come packaged with benefits to secular entities." (Corporation of Presiding Bishop v. Amos, supra, 483 U.S. at p. 338, 107 S.Ct. 2862.)
The court subsequently struck down a state religious exemption from a generally applicable sales tax on periodicals in Texas Monthly, Inc. v. Bullock (1989) 489 U.S. 1, 18, 109 S.Ct. 890, 103 L.Ed.2d 1, holding that the tax exemption violated the establishment clause of the First Amendment because there was no actual burden on free exercise rights and no "concrete need" to accommodate religious activity. There, however, the plurality opinion of Justice Brennan emphasized that the tax exemption had the effect of subsidizing the religious body in the distribution of its religious message. "[W]hen government directs a subsidy exclusively to religious organizations that is not required by the Free Exercise Clause and that either burdens nonbeneficiaries markedly or cannot reasonably be seen as removing a significant state-imposed deterrent to the free exercise of religion . . . it `provide[s] unjustifiable awards of assistance to religious organizations' and cannot but `conve[y] a message of endorsement' to slighted members of the community. [Citation.] This is particularly true where . . . the subsidy is targeted at writings that promulgate the teachings of religious faiths." (489 U.S. at p. 15, 109 S.Ct. 890, fn. and italics omitted.) Justice Blackmun, in whose opinion Justice O'Connor joined, also emphasized that the exemption constituted "preferential support for the communication of religious messages." (Id. at p. 28, 109 S.Ct. 890 (conc. opn. of Blackmun, J.).) Moreover, freedom of the press considerations not present here led Justices Blackmun, O'Connor, and White to concur in the judgment. Thus, in Texas Monthly there was no clear majority holding that the tax exemption, without more, violated the establishment clause.
We agree with the Court of Appeal that the Lemon test is ill-suited to assessing accommodating religious exemptions from neutral, generally applicable laws. Nonetheless, in the absence of further guidance from the Supreme Court as to the means by which the validity of such exemptions should be assessed, we will apply it here, assuming that we may uphold the exemption if the Legislature has a reasonable basis for concluding that landmark designation of noncommercial property owned by a religious entity may impose a significant burden on the ability of the owner to disseminate its message. (See Rowe v. Superior Court, supra, 15 Cal.App.4th at pp. 1731-1732, 19 Cal. Rptr.2d 625 ["Under well-established principles of establishment clause analysis, the government can legitimately relieve religious institutions of [a burden that] . . . can rationally be seen as posing a significant deterrent to the free exercise of religion." (Fn.omitted.)].)
And, of course, to protect against the evils the Lemon test seeks to identify and avoid, the court must ask whether providing an exemption from a historic landmark preservation law for noncommercial property owned by religious entities contributes to government sponsorship, financial support, or active involvement of the government in religious activity.
In our establishment clause analysis we also emphasize that this facial attack on the exemption created by sections 25373 and 37361 does not claim that exemption from landmark preservation laws broadly impinges upon an individual's exercise of a fundamental constitutional right or that in its general and ordinary application it does so. (Cf. American Academy of Pediatrics v. Lungren (1997) 16 Cal.4th 307, 347, 66 Cal.Rptr.2d 210, 940 P.2d 797.) Therefore we apply the well-established rule that a statute will not *292 be deemed facially invalid on constitutional grounds unless its provisions present a "`"`total and fatal conflict with applicable constitutional prohibitions,'"'" in all of its applications. (California Teachers Assn. v. State of California (1999) 20 Cal.4th 327, 338, 84 Cal.Rptr.2d 425, 975 P.2d 622; Tobe v. City of Santa Ana (1995) 9 Cal.4th 1069, 1084, 40 Cal.Rptr.2d 402, 892 P.2d 1145; Arcadia Unified School Dist. v. State Dept. of Education (1992) 2 Cal.4th 251, 267, 5 Cal.Rptr.2d 545, 825 P.2d 438.)
We are satisfied that the exemption authorized by sections 25373 and 37361 does not give rise to any of the evils the First Amendment and article I, section 4 seek to avoid. The exemption does not constitute sponsorship of, an award of governmental financial support to, or active involvement by the state in (Walz, supra, 397 U.S. at p. 668, 90 S.Ct. 1409) the religious enterprises of the owners of property made eligible for exemption at the option of the owner. The exemption does no more than permit a property owner to exempt its property from a landmark preservation law if the owner determines in a public forum that application of the law will cause substantial hardship that is likely to deny the owner economic return on the property, or deprive the owner of reasonable or appropriate use of its property in furthering the owner's religious mission.

1. Secular purpose.
Addressing the Court of Appeal decision, plaintiffs contend that the court erred in failing to properly apply this prong of the Lemon test under which, they argue, the exemption fails. They argue that the exemption in issue cannot be sustained because local preservation laws do not impose a special burden on religion. They assume that all landmark preservation laws create administrative and economic burdens on all property owners, but argue that economic costs do not constitute a substantial burden under the free exercise clause. Therefore, they contend, the state may not, under the guise of accommodating religious exercise, grant religious groups a direct economic benefit that is not available to secular property owners. In sum, plaintiffs argue, the exemption does not have a proper secular purpose.
The state disagrees and argues that a religious exemption is permissible if a potential free exercise violation is present. We agree. Although application of a landmark preservation law to property owned by a religious entity does not violate a religious entity's free exercise rights, insofar as the law may burden that right, an accommodating exemption is a proper, constitutionally permissible, secular purpose. (Corporation of Presiding Bishop v. Amos, supra, 483 U.S. at p. 335, 107 S.Ct. 2862.) The exemption in question here seeks only to relieve religious entities of a potential burden on free exercise.
As noted earlier, the Court of Appeal assumed that the exemption of noncommercial property owned by religious entities from local landmark preservation laws would not contravene the establishment clauses of the First Amendment or article I, section 4, if the Legislature had a rational basis for believing that such local ordinances did or might be perceived as substantially deterring the owners' free exercise of their religious beliefs.[5] The court reasoned: *293 "The state may lawfully act to reduce a burden on the religious freedom of those within its jurisdiction, especially where the burden is one imposed by the state itself. In doing so the state is not restricted to instances where an actual burden on religious freedom exists. Between intrusion prohibited by the free exercise clause and assistance prohibited by the establishment clause, the state must have room to maneuver. In this instance, given uncertainty over whether local historic preservation laws adopted pursuant to sections 25373 and 37361 would impinge upon the free exercise rights of religious entities, the state could rationally conclude action was necessary to avert a free exercise claim."
We do not agree with plaintiffs or the dissent that a religious exemption from a generally applicable law is permissible only if the law creates an actual, not simply *294 a potential, burden on free exercise of religion. As the court said in Walz, supra, 397 U.S. at page 673, 90 S.Ct. 1409, and reemphasized in Corporation of Presiding Bishop v. Amos, supra, 483 U.S. at page 334, 107 S.Ct. 2862, "[t]he limits of permissible state accommodation to religion are by no means co-extensive with the noninterference mandated by the Free Exercise clause." While in some circumstances an actual burden may be necessary to justify a judicially mandated exemption to the application of a law to a religious entity, legislatively created religious exemptions are permissible if the legislative body has reason to believe that the law may impose a burden on free exercise. Employment Div., Ore. Dept. of Human Res. v. Smith (1990) 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 supports our conclusion that whether an accommodating exemption is appropriate is a legislative question and that a legislative body may create an accommodating religious exemption to avoid potential burdens on the free exercise rights of religious entities. Smith was an as-applied challenge by Native Americans to the application of a state law prohibiting the use of peyote, a ban that was shown to actually, but permissibly, burden religious practices to which the use of peyote was integral. The court nonetheless declined to require that all laws imposing any burden on religious activity be justified by a compelling state interest, and thereby to create a judicial exemption to many such laws, stating that whether an accommodation to religion was appropriate was best left to the political process. (Id., at p. 890, 110 S.Ct. 1595.) The high court has thus confirmed that a legislative body has broad authority to determine that accommodation is appropriate in circumstances in which a court need not exempt the religious practice from a neutral, generally applicable law.
As observed earlier, sections 25373 and 37361 do not directly exempt any property owner from application of a landmark preservation law. They do no more than permit a religious entity to exempt its noncommercial property if an objection to landmark status is made and the owner determines in a public forum that imposition of landmark status will cause the owner to "suffer substantial hardship, which is likely to deprive the association or corporation of economic return on its property, the reasonable use of its property, or the appropriate use of its property in the furtherance of its religious mission." (§§ 25373, subd. (d)(2), 37361, subd. (c)(2).)
The dissent faults this aspect of sections 25373 and 37361, even though the Legislature could have simply exempted the property. Making exemption optional, the dissent argues, is a defect that fails to assure that the religious property owner's ability to freely exercise its religion has in fact been burdened. We do not agree that an actual burden must be demonstrable before an exemption is constitutionally permissible. If the Legislature could reasonably anticipate that imposing landmark status on the noncommercial property of religious organizations might significantly burden free exercise, an exemption is constitutionally permissible. Since the Legislature could have created a blanket exemption, an optional exemption that encourages maintenance of landmark status whenever possible is not constitutionally defective.
We are satisfied that the Legislature could reasonably believe that the restrictions accompanying designation as a historical landmark under local ordinances in California may burden the ability of a religious entity that owned the property to carry out its religious mission and that an accommodating exemption was appropriate. The Legislature was aware of the restrictions a historic preservation ordinance imposes on the landmark property and had before it the anecdotal evidence noted above of actual burdens on religious entities whose noncommercial property had been designated a landmark. (Ante, at fn. 5.) Those restrictions, including limitation of the right to alter or demolish a *295 designated landmark and responsibility to maintain the structure without access to governmental disaster or other assistance, may impose significant financial burdens on the owner of the property. Any significant financial burden, or simply the inability to demolish or alter a structure that is no longer suited to the needs of the owner, could affect the ability of many owners to carry out their religious missions. We do not agree with the dissent, therefore, that the exemption is impermissibly broad, because it recognizes that landmark status for their noncommercial property may create an indirect, but nonetheless substantial, burden on religious organizations. The Legislature could reasonably conclude that the potential burden of landmark designation justified an accommodating exemption for noncommercial properties owned by religious entities.
As the Supreme Court explained in Corporation of Presiding Bishop v. Amos, supra, 483 U.S. at page 335, 107 S.Ct. 2862, the secular purpose test is met if the government remains neutral in religious matters. It is a permissible neutral purpose to alleviate a significant governmental interference with the ability of a religious organization to carry out its religious mission. As the Court of Appeal concluded: "Between intrusion prohibited by the free exercise clause and assistance prohibited by the establishment clause, the state must have room to maneuver. In this instance, given uncertainty over whether local historic preservation laws adopted pursuant to sections 25373 and 37361 would impinge upon the free exercise rights of religious entities, the state could rationally conclude action was necessary to avert a free exercise claim."
Inasmuch as the Legislature could reasonably believe that landmark designation may result in denying the owner the economic benefit and appropriate use of the property necessary to fulfill the owner's religious mission, the exemption authorized by sections 25373 and 37361 meets the secular purpose test and thus satisfies the first prong of the Lemon test.

2. Principal or primary effect that neither advances nor inhibits religion.
Plaintiffs argue that the Court of Appeal also erred in holding that the exemption does not advance religion, but only facilitates the efforts of religious entities to advance their own purposes. They claim that the exemption from landmark status provides significant economic advantages to religious groups at the expense of neighboring property owners. Unlike the tax exemption considered by the court in Texas Monthly, Inc. v. Bullock, supra, 489 U.S. 1, 109 S.Ct. 890, 103 L.Ed.2d 1, however, exempting a property from landmark status does not have the effect of subsidizing the owner at the expense of other owners of landmarked property. The only impact of the exemption is that the owner may continue to use the property as it sees fit (subject to other applicable laws) to further its religious mission unrestricted by the historic preservation law. "A law is not unconstitutional simply because it allows churches to advance religions, which is their very purpose. For a law to have forbidden `effects' under Lemon, it must be fair to say that the government itself has advanced religion through its own activities and influence." (Corporation of Presiding Bishop v. Amos, supra, 483 U.S. at p. 337, 107 S.Ct. 2862.) Permitting a religious body to use its noncommercial property in the manner it did before a restrictive law was imposed on it does not constitute an impermissible advancement of religion by the state simply because some such property may be used to propagate the owner's religious message. (Ibid.) That the owner may enjoy an economic advantage over secular owners of landmark properties is not relevant. Unlike an exemption from taxes, an exemption from landmark status does not create a subsidy for religious activity by forcing other property owners to be vicarious donors or, since it does no *296 more than permit use of the property as it was before landmark designation, convey any message of governmental endorsement of religion.
The effort of the dissent to identify a means by which an exemption for landmark status subsidizes religious activity at the expense of the owners of other landmark properties or the community finds no support in the authorities on which it relies. There is no measurable or identifiable cost to others that can be attributed to an exemption from landmark status. The dissent suggests that when an owner exempts property from landmark status the exemption constitutes a subsidy in the form of a valuable privilege and creates a cultural and historic deficit that the community must make up. But no community is required to have a historical landmark ordinance and those that have such ordinances need not designate all eligible properties. The historical and cultural deficit, if such there be, can exist as easily from failure to designate as from the occasional exercise of the option to exempt a property. Indeed, the dissent itself recognizes that the subsidy to which the court referred in Texas Monthly was one that necessarily resulted from a tax exemptionthe need to offset the lost revenue through higher taxes on the nonexempt class.
That other nonprofit organizations do not benefit is not relevant in assessing neutrality since landmark status for properties they own does not threaten any free exercise rights of those organizations. Mitchell v. Helms (2000) 530 U.S. 793, 120 S.Ct. 2530, 147 L.Ed.2d 660, on which the dissent also relies for the argument that this exemption is not neutral or evenhanded, is simply not on point. The decision has nothing to do with the validity of an accommodating religious exemption from a neutral historic preservation law. The focus of the court in Mitchell v. Helms was pointedly and exclusively on application of the Lemon test, as adapted in Agostini v. Felton (1997) 521 U.S. 203, 117 S.Ct. 1997, 138 L.Ed.2d 391, to governmental assistance to parochial schools. Nothing in that decision supports the conclusion of the dissent that permitting an exemption of noncommercial property[6] owned by a religious entity from a law that may burden free exercise of religion is not neutral and evenhanded.
We therefore agree with the Court of Appeal that permitting a religious organization to continue using its property in the manner it would have done but for landmark designation is not an impermissible endorsement of religion and the use of the property cannot be attributed to the state. (Corporation of Presiding Bishop v. Amos, supra, 483 U.S. at p. 337, 107 S.Ct. 2862.) No burden is shifted from the religious entity that owns the property to owners of other landmark properties. The second prong of the Lemon test is satisfied.

3. Excessive governmental entanglement with religion.
Plaintiffs also contend that permitting a religious entity to invoke an exeruption *297 to landmark preservation laws does not simply restore to religious entities the power to affect their own interests, as the Court of Appeal reasoned, but necessarily enmeshes those bodies in a substantial exercise of governmental power.
To determine if the state is impermissibly entangled with religious activity under the Lemon test, the court considers "the character and purposes of the institutions that are benefited, the nature of the aid that the State provides, and the resulting relationship between the government and the religious authority." (Lemon v. Kurtzman, supra, 403 U.S. at p. 615, 91 S.Ct. 2105; see also Jimmy Swaggart Ministries v. Cal. Bd. of Equalization (1990) 493 U.S. 378, 393, 110 S.Ct. 688, 107 L.Ed.2d 796.)
Here, of course, religious institutions benefit from the exemption. However, the state provides no aid other than leaving noncommercial properties owned by religious entities alone if the owner seeks exemption. The exemption process does not create any relationship between those entities and the state.
The state itself is not implicated in the exemption process. The owner, after objecting to imposition of landmark status, may exempt itself from a local landmark preservation law. The owner may do so by determining in a public forum that it will suffer substantial hardship in carrying out its religious mission because the restrictions accompanying that status will deprive it of the economic benefit it would otherwise receive from the property when that benefit is necessary to carry out the owner's religious mission, will deprive it of the reasonable use of the property to carry out the owner's religious mission, or will deprive it of a use appropriate to carrying out the owner's religious mission.
None of this enmeshes the government in religion. There is no delegation of substantial governmental authority to the religious entities that own exempt properties, and thus no entanglement between them and the state. Unlike the authority granted to churches to preclude the grant of liquor licenses to establishments near a church or school that was found to violate the establishment clause in Larkin v. Grendel's Den (1982) 459 U.S. 116, 103 S.Ct. 505, 74 L.Ed.2d 297, here there is no opportunity for favoritism by the religious entity and no appearance of joint exercise of legislative power by the church and the state. The exercise of legislative power ends with the enactment of the enabling statutes.
While the nature of the public forum in which the hardship determination is made is not fixed by sections 25373 and 37361, it is not a governmental forum. The requirement that the determination of substantial hardship be made in a public forum appears to contemplate a public hearing at which the owner's assertion of hardship may be questioned, but there is no requirement of governmental approval or review of a hardship determination. A declaration by the owner of the property that an objection to imposition of landmark status was made, a public hearing held, and a determination of substantial hardship made and filed with the designated local agency, should suffice.
The third prong of the Lemon test is also satisfied.
The most recent federal circuit court decision addressing the establishment clause implications of an exemption statute supports our conclusion. In Ehlers-Renzi v. Connelly School of the Holy Child, Inc. (4th Cir.2000) 224 F.3d 283,[7] the law challenged on establishment clause grounds exempted parochial schools located on land owned or leased by a religious organization from a "special exception" requirement imposed on other owners who sought to build nonresidential facilities in a residential *298 zone. The issue arose when a Roman Catholic college preparatory school notified neighboring landowners that it had elected to exempt itself from seeking a special exception for the expansion of its facilities. The court recognized that accommodation of religion is an "authorized and sometimes mandatory aspect" of "Establishment Clause jurisprudence" (id. at p. 287), and that such accommodation satisfies the Lemon test, as adapted to exemptions in Corporation of Presiding Bishop v. Amos, supra, 483 U.S. 327, 107 S.Ct. 2862, 97 L.Ed.2d 273.
Addressing the three prongs of the Lemon test, the court reasoned that the secular purpose test was met in a facial challenge if a plausible secular purpose appeared on the face of the law. It had no difficulty in finding such a purpose. The exemption made it possible to avoid interference with the religious mission of parochial schools that might occur if they were subjected to the otherwise applicable requirements of the zoning ordinance. By allowing the exemption the county simply stepped out of the way of religion and relieved the school of having to justify its religious or religion-related needs. This also spared the county from having to resolve disputes with religious underpinnings. "In short, the low threshold of this first Lemon prong is readily cleared by the Zoning Ordinance's plausible purpose of extricating Montgomery County from these involvements in religion." (Ehlers-Renzi v. Connelly School of the Holy Child, Inc., supra, 224 F.3d at p. 289.) The parallel to the instant case is obvious. No actual interference was deemed necessary to justify the exemption. The court looked only to whether the legislative body had a plausible sectarian purpose for the exemption, and, as suggested in Corporation of Presiding Bishop v. Amos, supra, 483 U.S. 327, 107 S.Ct. 2862, 97 L.Ed.2d 273, concluded that relieving the school of potential interference with its religious activity satisfied that test.
The court found the second prong of the Lemon testwhether the exemption had a principal or primary effect of advancing or inhibiting religion was also satisfied, concluding that an exemption that simply allowed a religious school to advance its purposes was not constitutionally prohibited. The government itself was not, through its own activities or influence, advancing religion. (Ehlers-Renzi v. Connelly School of the Holy Child, Inc., supra, 224 F.3d at p. 291.) The third, or excessive entanglement, prong was met since the exemption had the effect of disentangling the government from intrusion into religious matters. (Id., at p. 292.) Again, the parallels to the instant case are obvious. An exemption from a landmark preservation law simply allows the property owner to use the property as it did before landmark status was imposed. By permitting the religious organization that owns the property to exempt itself, sections 25373 and 37361 avoid any governmental entanglement with religion.
We conclude therefore, that sections 25373 and 37361 do not run afoul of the establishment clause of the First Amendment.

B. Article I, Section 4 Establishment Clause.
We reach the same conclusion under the California Constitution.
Because the California Constitution is a document of independent force, the rights it guarantees are not necessarily coextensive with those protected by the federal Constitution. (American Academy of Pediatrics v. Lungren, supra, 16 Cal.4th at p. 325, 66 Cal.Rptr.2d 210, 940 P.2d 797; Raven v. Deukmejian (1990) 52 Cal.3d 336, 351-355, 276 Cal.Rptr. 326, 801 P.2d 1077.) We do not believe, however, that the protection against the establishment of religion embedded in the California Constitution creates broader protections than those of the First Amendment. We are satisfied that the California concept of a "law respecting an establishment of religion" (art. *299 I, § 4) coincides with the intent and purpose of the First Amendment establishment clause.
We reach this conclusion because the establishment clause was not added to article I, section 4 until 1974.
When article I, section 4 was readopted with minor editorial changes by the electorate as part of the constitutional revisions made in 1974, the present establishment clause was included. The Legislative Analyst and the Chairman of the Constitution Revision Commission each explained that the intent was to add to the California Constitution a right that was then contained in the federal Constitution. (Ballot Pamp., Gen. Elec. (Nov. 5, 1974) Analysis by Legis. Analyst, p. 26; id., argument in favor of Prop. 7, p. 28.) Presumably, the electorate intended that the right being added to article I, section 4 through the new establishment clause would afford the same protection as the establishment clause of the First Amendment on which it was patterned. There is nothing in the history of the clause to suggest that the drafters or the electorate intended that the clause be any more protective of the doctrine of separation of church and state than the First Amendment establishment clause.
We have long emphasized that there must be cogent reasons for a departure from a construction placed on a similar constitutional provision by the United States Supreme Court. (People v. Monge (1997) 16 Cal.4th 826, 844, 66 Cal.Rptr.2d 853, 941 P.2d 1121; Raven v. Deukmejian, supra, 52 Cal.3d at p. 353, 276 Cal.Rptr. 326, 801 P.2d 1077; Gabrielli v. Knickerbocker (1938) 12 Cal.2d 85, 89, 82 P.2d 391.) That admonition has particular force when the expressly stated purpose of the provision was to add a protection already part of the federal Constitution to our charter of liberties. Our construction of the establishment clause of article I, section 4 is therefore guided by decisions of the Supreme Court.
Having concluded above that the exemption does not violate the establishment clause of the First Amendment, we need not address the state's argument that an exemption from landmark preservation laws is required by the free exercise clause of the First Amendment.

C. Article I, Section 4 No-Preference Provision.
Plaintiffs also contend that exempting property owned by religious entities from landmark status violates the no-preference provision of the free exercise clause of article I, section 4. They argue that the nopreference provision of the California Constitution is a broader guarantee of separation of church and state than the establishment clause, that it is more protective of that principle than the federal Constitution (Sands v. Morongo Unified School Dist. (1991) 53 Cal.3d 863, 883, 281 Cal.Rptr. 34, 809 P.2d 809), and that under it, "[p]reference . . . is forbidden even when there is no discrimination." (Fox v. City of Los Angeles (1978) 22 Cal.3d 792, 796, 150 Cal. Rptr. 867, 587 P.2d 663.)
This court has never had occasion to definitively construe the no-preference clause of article I, section 4 and we need not do so here. In guaranteeing free exercise of religion "without discrimination or preference," the plain language of the clause suggests, however, that the intent is to ensure that free exercise of religion is guaranteed regardless of the nature of the religious belief professed, and that the state neither favors nor discriminates against religion. Having concluded above that an exemption from a landmark preservation law satisfies all prongs of the Lemon test, it follows that the exemption is neither a governmental preference for or discrimination against religion.
Neither the history nor the language of the no-preference clause supports plaintiffs' argument that the clause bans governmental accommodation of religion or religious belief in general. We do not agree, therefore, that the no-preference *300 clause bars exemption from landmark preservation ordinances for property owned by a religious entity as a constitutionally impermissible preference for religion and discrimination against nonreligious owners of noncommercial property subject to landmark designation.

IV

Does the Exemption from Landmark Restrictions Violate Article XVI, Section 5?
The Court of Appeal rejected plaintiffs' argument that exempting noncommercial property owned by religious entities from the restrictions of landmark status violates the ban on aid to religion found in article XVI, section 5. It reasoned that article XVI, section 5 does not prohibit indirect, remote, or incidental benefits that have a primary public purpose.
Article XVI, section 5 provides: "Neither the Legislature, nor any county, city and county, township, school district, or other municipal corporation, shall ever make an appropriation, or pay from any public fund whatever, or grant anything to or in aid of any religious sect, church, creed, or sectarian purpose, or help to support or sustain any school, college, university, hospital, or other institution controlled by any religious creed, church, or sectarian denomination whatever nor shall any grant or donation of personal property or real estate ever be made by the State, or any city, city and county, town, or other municipal corporation for any religious creed, church, or sectarian purpose whatever; provided, that nothing in this section shall prevent the Legislature granting aid pursuant to Section 3 of Article XVI."[8]
In California Educational Facilities Authority v. Priest (1974) 12 Cal.3d 593, 605, footnote 12, 116 Cal.Rptr. 361, 526 P.2d 513, this court rejected an argument that article XVI, section 5, then article XIII, section 24, prohibits only direct appropriation or expenditure of public funds to support sectarian institutions: "We do not read section 24 so narrowly. Its terms forbid granting `anything' to or in aid of sectarian purposes, and prohibit public help to `support or sustain' a sectarian-controlled school. The section thus forbids more than the appropriation or payment of public funds to support sectarian institutions. It bans any official involvement, whatever its form, which has the direct, immediate, and substantial effect of promoting religious purposes."
Plaintiffs argue that the Court of Appeal erred in dismissing their claim that the exemption created by sections 25373 and 37361 violates the ban on aid to religious organizations or institutions controlled by religious entities. They contend that the benefit of exemption from landmark status cannot be characterized as indirect, remote, or incidental to a primarily public purpose.
As the Court of Appeal observed, however, permitting a religious entity to exempt its noncommercial property from landmark designation status simply leaves the property in the status it otherwise occupied. While there may be a benefit as compared to properties that are subjected to landmark designation, neither the state nor the local governmental entity expends funds, or provides any monetary support, for the exempted property or its owner.
Nothing in California Educational Facilities Authority v. Priest, supra, 12 Cal.3d at page 605, footnote 12, 116 Cal. *301 Rptr. 361, 526 P.2d 513, suggests that exempting these properties from the restrictions of landmark status violates article XVI, section 5. The exemption does not give rise to any governmental involvement in the entities or institutions that benefit from the exemption, and even assuming that some parochial schools will benefit from the exemption, that benefit is not the "support" contemplated by and banned by article XVI, section 5.
We conclude therefore, that no provision of the federal or state Constitution is violated by the Legislature's creation of exemptions from local landmark preservations laws for property owned by religious entities. As the Court of Appeal held, these exemptions simply free the owners to use the property as they would have done had the property not been designated a historic landmark.

V

Disposition.
The judgment of the Court of Appeal is affirmed.
KENNARD, J., CHIN, J, and BROWN, J., concur.
Dissenting Opinion by MOSK, J.
I dissent.
In analyzing whether Government Code sections 25373 and 37361 impermissibly grant preferential treatment to religious organizations, both the majority and dissenting opinions herein give short shrift to state authority. In my view, state law and state constitutional principles should be our first and sole referent in this matter. "[A]s the highest court of this state, we are independently responsible for safeguarding the rights of our citizens. State courts are, and should be, the first line of defense for individual liberties in the federal system. It is unnecessary to rest our decision on federal authority when the California Constitution alone provides an independent and adequate state constitutional basis on which to decide." (Sands v. Morongo Unified School Dist. (1991) 53 Cal.3d 863, 906, 281 Cal.Rptr. 34, 809 P.2d 809 (cone. opn. of Mosk, J.).)
I conclude that Government Code sections 25373 and 37361, which confer on religious organizations a unilateral right to exempt themselves from historic landmark preservation laws applicable to all other property owners, cannot be reconciled with the strict neutrality required by article I, section 4, and article XVI, section 5 of the California Constitution. On that basis, I would reverse the judgment.

I
Article I, section 4 of the California Constitution (hereafter article I, section 4) provides, "Free exercise and enjoyment of religion without discrimination or preference are guaranteed. . . . The Legislature shall make no law respecting an establishment of religion."
The majority short-circuit any review under the state constitutional provision. With regard to the establishment clause, they assert that because the exemption under Government Code sections 25373 and 37361 does not "run afoul of the establishment clause of the First Amendment" of the United States Constitution under the test articulated in Lemon v. Kurtzman (1971) 403 U.S. 602, 91 S.Ct. 2105, 29 L.Ed.2d 745, it necessarily also satisfies the requirements of the establishment clause under article I, section 4 of the California Constitution. (Maj. opn., ante, 102 Cal.Rptr.2d at p. 298, 13 P.3d at p. 1138.) Likewise, with regard to the preference clause, they conclude that because there was no federal constitutional bar to the exemption for religious organizations, "it follows" that the statutes also satisfy the preference clause under our state constitutional provision. (Maj. opn, ante, at p. 299, 13 P.3d at p. 1139.)
I strongly disagree that the federal Constitution dictates either the analysis or result in this case.
*302 Our state constitutional law is analytically distinct and more protective of the principle of church-state separation than the First Amendment. "It is undisputed that provisions of the California Constitution are not dependent for their meaning on the federal Constitution. [Citation.] . . . [T]he different history of our charter justifies the difference in interpretation." (Sands v. Morongo Unified School Dist, supra, 53 Cal.3d at p. 907, 281 Cal.Rptr. 34, 809 P.2d 809 (cone. opn. of Mosk, J.).) Thus, although federal cases concerning the First Amendment may be illustrative in interpreting our state constitutional provision, they are not dispositive.
Specifically, while I agree that the test under Lemon v. Kurtzman, supra, 403 U.S. 602, 91 S.Ct. 2105, offers guidance for analyzing the exemption herein under our state establishment clause, I disagree that we are exclusively bound by any particular application of that test by federal authority. To be sure, as the majority observe, the state establishment clause was not added until 1974; but the voters did not thereby indicate their intention that our courts strictly adhere to the construction placed on the federal establishment clause by the United States Supreme Court, as the majority assert. On the contrary, in the same election, the voters also added an express declaration of state constitutional independence in article I, section 24, which provides that "[r]ights guaranteed by this Constitution are not dependent on those guaranteed by the United States Constitution." "[I]t is clear from the drafters' debates that article I, section 24, of the state Constitution (`Rights guaranteed by this Constitution are not dependent on those guaranteed by the United States Constitution') was specifically intended to allow our state courts to give greater scope to the California Constitution than that required by the federal high court to similar, or even identical, language of the United States Constitution." (Sands v. Morongo Unified School Dist, supra, 53 Cal.3d at p. 910, fn. 3, 281 Cal.Rptr. 34, 809 P.2d 809 (cone. opn. of Mosk, J.).)
With regard to the preference clause under article I, section 4which "is without parallel in the federal Constitution" (Sands v. Morongo Unified School Dist, supra, 53 Cal.3d at p. 910, 281 Cal.Rptr. 34, 809 P.2d 809 (cone. opn. of Mosk, J.)) our independence from federal precedent is still more complete. "`It would be difficult to imagine a more sweeping statement of the principle of governmental impartiality in the field of religion.' [U]nder article I, section, 4, `Preference thus is forbidden even when there is no discrimination. The current interpretations of the United States Constitution may not be that comprehensive.'" (Id. at pp. 910-911, 281 Cal.Rptr. 34, 809 P.2d 809.)
In my view, the exemption under Government Code sections 25373 and 37361 for religious organizations clearly violates both the establishment and the preference clauses of article I, section 4.[1]
To withstand scrutiny under our state establishment clause the statute must be neutral toward religion: it must have a secular legislative purpose, its principal or primary effect must be one that neither advances nor inhibits religion, and it must not foster an excessive governmental entanglement with religion. (Lemon v. Kurtzman, supra, 403 U.S. at pp. 612-613, 91 S.Ct. 2105.)
State action with regard to religion must satisfy all of the foregoing requirements. The provisions at issue herein satisfy none. They impermissibly single out religious organizations for a special exemption from generally applicable historic landmark *303 preservation laws at the expense of other property owners and to the detriment of the local community's ability to preserve its history and character. And they do so by improperly delegating traditional secular governmental powers to the religious organizations themselves.
First, the statutes do not serve a proper secular purpose. The majority effectively concede that there is no substantial evidentiary basis for concluding that the statutes were necessary to alleviate any actual or significant burdens on religion; they assert instead that the Legislature could reasonably have concluded that the provisions reduce a potential burden on the free exercise of religion. But it is not enough that local historic landmark preservation laws might in some conceivable situation impose some burden on a religious organization, however insignificant and however unrelated to a religious mission. The majority's flawed approach could be used to justify exempting religious organizations from any neutral law of general applicability. Nor does it find support in the state or federal case law. The sole authority they cite for the proposition, Employment Din, Ore. Dept. of Human Res. v. Smith (1990) 494 U.S. 872, 110 S.Ct. 1595, is simply not in point. Until this case, no court has upheld a legislative enactment challenged under the establishment clause on the basis of a merely theoretical burden.
Second, Government Code sections 25373 and 37361 have the primary effect of advancing religion. They extend to sectarian organizations a substantial economic advantage over secular owners of historic landmark properties. The majority assert that the statutes merely "permit use of the property as it was before landmark designation," as the majority contend. (Maj. opn., ante, 102 Cal.Rptr.2d at pp. 295-296, 13 P.3d at p. 1136.) But by permitting only religious organizations to avoid the effect of historic landmark preservation laws imposed generally on all property owners, the statutes do more than simply preserve the status quo ante. Under the broad provisions of the statute, a church or other religious organization may exempt itself from landmark regulations for purely economic reasonsincluding to modify the site solely for financial advantage unrelated to its religious missionwhile a secular organization with indistinguishable property may not. Such a valuable privilege clearly amounts to an impermissible preference for religion.
Third, Government Code sections 25373 and 37361 excessively entangle church and state. They delegate to religious organizationsand religious organizations only the power to determine their own eligibility for an exemption from historic landmark preservation laws, with no requirement of review by a neutral governmental arbiter. The statutes thus substitute the unilateral power of a church for the reasoned decisionmaking of a public legislative body, creating a danger of "`[political fragmentation and divisiveness on religious lines.'" Larkin v. Grendel's Den, Inc. (1982) 459 U.S. 116, 127, 103 S.Ct. 505, 74 L.Ed.2d 297.) It is indefensible for the majority to attempt to justify this ceding of governmental authority to a religious organization on the basis that there is "no opportunity for favoritism by the religious entity." (Maj. opn., ante, 102 Cal.Rptr.2d at p. 297, 13 P.3d at p. 1137.)
In addition, article I, section 4 includes a broad guarantee of separation of church and state: "Free exercise . . . without discrimination or preference. . . ." (Italics added.) Under the section, "[p]reference thus forbidden even when there is no discrimination." (Fox v. City of Los Angeles (1978) 22 Cal.3d 792, 796, 150 Cal.Rptr. 867, 587 P.2d 663.) It prevents government from according any advantage to religion in California. "The relevant inquiry is whether government has granted a benefit to a religion or religion in general that is not granted to society at large. Once government bestows that differential benefit on religion, it has acted unconstitutionally in this state." (Sands v. Morongo *304 Unified School Dist, supra, 53 Cal.3d at pp. 911-912, 281 Cal.Rptr. 34, 809 P.2d 809, fn. omitted (cone. opn. of Mosk, J.).) The statutes herein bestow just such an impermissible differential benefit by allowing religious organizations to exercise control over their buildings and land, including for purely economic purposes, while subjecting secular organizations or individuals owning identical property to the financial burdens and developmental restrictions inherent in historic landmark designation.

II
Article XVI, section 5 of the California Constitution (hereafter article XVI, section 5) prohibits government from "grant[ing] anything to or in aid of any religious sect, church, creed, or sectarian purpose."
As we have previously explained, in recounting the history of article XVI, section 5: "An examination of the debates of the constitutional convention which drafted the Constitution of 1879 indicates that the provision was intended to insure the separation of church and state and to guarantee that the power, authority, and financial resources of the government shall never be devoted to the advancement or support of religious or sectarian purposes." (California Educational Facilities Authority v. Priest (1974) 12 Cal.3d 593, 604, 116 Cal. Rptr. 361, 526 P.2d 513.) "Its terms forbid granting `anything' to or in aid of sectarian purposes. . . . The section thus forbids more than the appropriation or payment of public funds to support sectarian institutions. It bans any official involvement, whatever its form, which has the direct, immediate, and substantial effect of promoting religious purposes." (Id. at p. 605, fn. 12, 116 Cal.Rptr. 361, 526 P.2d 513.) It represents "the definitive statement of the principle of government impartiality in the field of religion." (37 Ops.Cal.Atty.Gen. 105, 107 (1961).)
The majority wrongly conclude that Government Code sections 25373 and 37361 survive review under article XVI, section 5, again on the ground that the exemption for religious organizations "simply leaves the property in the status it otherwise occupied." (Maj. opn., ante, 102 Cal.Rptr.2d at p. 300, 13 P.3d at p. 1140.) Again, there is a glaring flaw in the majority's analysis: By not also leaving comparable property owned by nonsectarian organizations in the status it otherwise occupied, the statutes provide a direct and palpable benefit for religious organizations, at the expense of the community at large. The statutes are not religiously neutral: religious organizations alone may be able to avoid the economic burdens and developmental restrictions imposed by historic landmark preservation laws. Thus, a church or other sectarian entity can, if it chooses, destroy a historic building for the purpose of erecting an office building simply for financial advantage. But a secular nonprofit organization or an individual owner would be required to maintain the same building no matter how great its potential for development.

III
This is an easy case. Under Government Code sections 25373 and 37361, the Legislature has conferred on religious organizations a governmental power that is not enjoyed by any other property owners. Such favoritism toward religion is prohibited under our state constitutional provisions forbidding the establishment of religion (art. I, § 4), the preference for religion (ibid.), and aid to religion (art. XVI, § 5). The statutes should be held invalid.
For these reasons, I dissent.
Dissenting Opinion by WERDEGAR, J.
"The challenge posed . . . is how to define the proper Establishment Clause limits on voluntary government efforts to facilitate the free exercise of religion." Wallace v. Jaffree (1985) 472 U.S. 38, 82, 105 S.Ct. 2479, 86 L.Ed.2d 29 (cone. opn. of O'Connor, J.).)
*305 The freedom to exercise one's religion without government prohibition is a cornerstone of our constitutional system. Motivated by the desire to give that freedom full scope in practice, legislatures sometimes grant religious adherents and institutions special relief from taxes and regulations. Legal efforts to assist religious institutions and promote their activities are also naturally popular with legislators because those organizations perform crucial charitable, educational, and community-building functions that enrich society generally. But however well motivated such laws may be, if they go too far they stand to run afoul of the simple, but fundamental, constitutional principle that government must remain neutral among religious groups and adherents, and between religious and nonreligious members of societythat legislation may not have the purpose or effect of advancing, promoting, or endorsing religion or any particular religion. (Board of Ed. of Kiryas Joel Village School Dist. v. Grumet (1994) 512 U.S. 687, 696, 114 S.Ct. 2481, 129 L.Ed.2d 546; Lemon v. Kurtzman (1971) 403 U.S. 602, 612, 91 S.Ct. 2105, 29 L.Ed.2d 745; Walz v. Tax Commission (1970) 397 U.S. 664, 668-670, 90 S.Ct. 1409, 25 L.Ed.2d 697; Everson v. Board of Education (1947) 330 U.S. 1, 15, 18, 67 S.Ct. 504, 91 L.Ed. 711.)
Of course, not every law or government action that helps a religious organization violates the First Amendment's bar on laws respecting the establishment of religion. The permissibility of two types of aid or relief is both logical and well established. First, government may provide assistance for organizations to conduct a nonreligious activity, offering help on an impartial basis to sectarian and secular groups alike, though religious organizations are thereby incidentally benefited. (Mitchell v. Helms (2000) 530 U.S. 793, 807-816, 857-858, 120 S.Ct. 2530, 2540-2544, 2567, 147 L.Ed.2d 660; California Educational Facilities Authority v. Priest (1974) 12 Cal.3d 593, 600-602, 116 Cal. Rptr. 361, 526 P.2d 513.) Second, government may target help to religious individuals and groups, in the form of relief from the burdens of generally applicable legislation, when application of the general law would significantly impair the person's or group's free exercise of religion. (Texas Monthly, Inc. v. Bullock (1989) 489 U.S. 1, 18-19, fn. 8,109 S.Ct. 890,103 L.Ed.2d 1 (plur. opn. of Brennan, J.) (Texas Monthly); Corporation of Presiding Bishop v. Amos (1987) 483 U.S. 327, 334-336, 107 S.Ct. 2862, 97 L.Ed.2d 273 (Corporation of Presiding Bishop); Wallace v. Jaffree, supra, 472 U.S. at pp. 82-83, 105 S.Ct. 2479 (cone. opn. of O'Connor, J.).)
The laws at issue here, sections 25373, subdivision (d) and 37361, subdivision (c) of the Government Code (hereafter sections 25373(d) and 37361(c)), cannot be defended on either basis. Their assistance is expressly restricted to "religiously affiliated" organizations (ibid.); those entities are granted the power (unusual, to say the least) to exempt themselves from certain land use regulations, while no comparable relief is provided to nonprofit secular organizations whose noncommercial activities may be similarly affected by the same regulations. Clearly, therefore, these provisions cannot be justified as an impartial grant of nonreligious assistance.
Nor, in light of their unusual character and extraordinary breadth, can the laws fairly be characterized as a mere attempt to prevent government interference with religious practices. Under sections 25373(d) and 37361(c), a religiously affiliated organization may exempt itself from a landmark regulation not only when the regulation would interfere with its religious mission, but also when the regulation would have no significant effect on the exercise of religion but would, according to the organization's own declaration, deprive it of "economic return" on, or the "reasonable use" of, its property. (§§ 25373(d)(2), 37361(c)(2).) Perhaps most extraordinarily, rather than merely permitting individual religious organizations to obtain exemptions from the landmark *306 laws by application and with a showing that the group's religious practices will otherwise be impaired, the statutes permit a religious group to exempt itself, without any actual showing of need, any assurance that the exempted property is or will remain in religious use, or any governmental review of the self-declared hardship exemption.
The majority responds to these obvious defects in the legislation with the mantra that sections 25373(d) and 37361(c) do not assist religious groups in any way, but merely accommodate their religious practices by removing a government-imposed burden. In the words of the Court of Appeal, "[t]he state has not assisted religious organizations but has merely stepped out of their way." Repetition of a facile formula, however, cannot substitute for constitutional scrutiny. When the state removes legal barriers from one landowner's use and exploitation of its property and not from another's, has not the state effectively assisted the former and advanced its mission, both absolutely and as compared to the latter? This type of preferential treatment would be constitutionally permissible if justified by a concrete need to avoid interference with religious practice; absent that justification, the state's decision to "step out of the way" only of religious organizations must be seen by an objective observer as an endorsement of religious enterprises, violating the fundamental principle of government neutrality in matters of religion. (Texas Monthly, supra, 489 U .S. at p. 15, 109 S.Ct. 890.)
As Justice O'Connor has observed, the distinction between government's advancing religion and government's taking measures that allow religion to better advance itself "seems . . . to obscure far more than to enlighten. Almost any government benefit to religion could be recharacterized as simply `allowing' a religion to better advance itself, unless perhaps it involved actual proselytization by government agents." (Corporation of Presiding Bishop, supra, 483 U.S. at p. 347, 107 S.Ct. 2862 (cone. opn. of O'Connor, J.).) Particularly in the area of urban land use, where pervasive legal regulation forms the background for private action, a special exemption from regulation constitutes a benefit to the property owner, both absolutely and relative to others in the marketplace. To call such an exemption an "accommodation" of religion adds nothing to the analysis unlessas is not the case herethe exemption is granted to avoid a demonstrable interference with worship or other religious practices. A law that singles out religious organizations alone for exemption from regulation, without requiring any showing that, absent the exemption, religious freedom will be impaired, has, whatever label it wears, "crossed the line from permissible accommodation to unconstitutional establishment." (Lee v. Weisman (1992) 505 U.S. 577, 629, 112 S.Ct. 2649, 120 L.Ed.2d 467 (cone. opn. of Souter, J.).)
The majority nonetheless regards as justified the blanket grant to religious landowners of self-exemption power, because "the Legislature could reasonably believe that the restrictions accompanying designation as a historical landmark . . . may burden the ability of a religious entity . . . to carry out its religious mission." (Maj. opn., ante, 102 Cal.Rptr.2d at p. 295, 13 P.3d at p. 1136.) In fact, the case law does not support this kind of deference to presumed legislative beliefs. (See Texas Monthly, supra, 489 U.S. at p. 18 & fn. 8, 109 S.Ct. 890 [blanket sales tax exemption for religious periodicals not justified as lifting burden on exercise of religion where "[n]o concrete need to accommodate religious activity has been shown" and exemption therefore "does not remove a demonstrated and possibly grave imposition on religious activity"]; Corporation of Presiding Bishop, supra, 483 U.S. at p. 348, 107 S.Ct. 2862 (cone. opn. of O'Connor, J.) ["Of course, in order to perceive the government action as a permissible accommodation of religion, there must in fact be an identifiable burden on the exercise *307 of religion that can be said to be lifted by the government action"]; Duffy v. State Personnel Bd. (1991) 232 Cal.App.3d 1, 12, 283 Cal.Rptr. 622 [adopting and applying Justice O'Connor's standard].)
The majority thus errs in its deference to the Legislature on this point, for "judicial deference to all legislation that purports to facilitate the free exercise of religion would completely vitiate the Establishment Clause." (Wallace v. Jaffree, supra, 472 U.S. at p. 82, 105 S.Ct. 2479 (cone. opn. of O'Connor, J.).) Perhaps even more fundamental a flaw in the majority's approach, however, is the extraordinary and unjustifiable breadth of the presumed finding to which the majority defers. To reiterate, sections 25373(d) and 37361(c) do not require any neutral government body, such as a zoning or planning board, to determine the organization's need for an exemption; rather, the laws allow the organization to grant itself the exemption upon making certain unreviewable "determinations." Those determinations, moreover, need not even include a claim that the landmark regulation will impede the organization's religious practice; instead, the organization may simply find its economic use of the property will be impaired. To hold, then, that these statutes, in the legislative view, serve primarily to prevent government interference with religious practice, we would need to ascribe to the Legislature the finding that all religious groups owning a landmarked noncommercial property will be impeded in their religious missions unless they are given the power to exempt themselves from landmark laws by making an unreviewable claim that the regulation would make their use of the property uneconomical, whether or not the property has been or will be used for purposes the group itself defines as religious. Even were we to ascribe such an absurd belief to the Legislature, I submit, it would not be entitled to any deference even under the majority's standard of deference to "reasonable" legislative judgments.
I therefore believe the challenged provisions, granting to religious entities alone the power to exempt themselves from economically burdensome land use regulations, without requiring a showing in a given case that application of the regulations would impede any religious practice, go far beyond a reasonable accommodation of the exercise of religion and, as a practical matter, grant a significant, unjustified and preferential benefit to religious organizations. As will be demonstrated in more detail below, such legislation cannot be enforced consistently with the establishment clause of the federal Constitution's First Amendment.[1]

DISCUSSION
Under the analysis articulated in Lemon v. Kurtzman, supra, 403 U.S. at pages 612-613, 91 S.Ct. 2105, a statute providing aid to religious individuals or organizations violates the establishment clause unless it has a secular legislative purpose, has as its primary effect neither the advancement nor the suppression of religion, and does not foster excessive entanglement of government with religion. The Lemon test, and especially its first two parts, embodies the core principle of the clause: government neutrality among religious creeds, and between religious and nonreligious viewpoints and organizations. (See, e.g., Texas Monthly, supra, 489 U.S. at pp. 8-9, 109 S.Ct. 890.) Although this opinion does not follow Lemon's organization, which I do not take to be talismanic, it does attempt to determine whether sections *308 25373(d) and 37361(c) are neutral in design and consequence, and whether they create an excessive entanglement by improperly delegating governmental functions to private religious organizations.
Justice Souter recently observed that the term "neutrality" has borne at least three distinct meanings in establishment clause debate. It has been used to denote the required position of government as neither promoting nor impeding religion; to describe government assistance that is not inherently religious in its content or character; and to describe the generality, or evenhandedness, with which some item of government service or assistance is given to secular and sectarian organizations alike. (Mitchell v. Helms, supra, 530 U.S. at pp. 878-882, 120 S.Ct. at pp. 2578-2580 (dis. opn. of Souter, J.).) We are concerned here with the first and third meanings.
In part I of the discussion, I will focus on whether the self-exemption provisions of sections 25373(d) and 37361(c) may be considered neutral in Justice Souter's first senseas merely accommodating, but not advancing or promoting, religion; I conclude they may not, because the assistance they provide goes far beyond any relief that might be needed to prevent landmark regulation from interfering with free exercise. Part II of the discussion examines the last sense, or dimension, of neutrality identified by Justice Souter and argues that, in their unnecessary lack of evenhandedness or generality, sections 25373(d) and 37361(c) demonstrate nonneutrality in this third sense as well.

I. Accommodation, Advancement and Endorsement

A. The Role of Burden
"Whatever else may define the scope of accommodation permissible under the Establishment Clause, one requirement is clear: accommodation must lift a discernible burden on the free exercise of religion." (Lee v. Weisman, supra, 505 U.S. at p. 629, 112 S.Ct. 2649 (cone. opn. of Souter, J.).)
Laws "accommodating" religious freedom have been viewed as having a secular goal for purposes of the Lemon test. (See Corporation of Presiding Bishop, supra, 483 U.S. at p. 335, 107 S.Ct. 2862.) With good reason, Justice O'Connor has declined to embrace this characterization, or the application of the Lemon test to accommodation cases generally. She regards such laws as having a religious purpose and effect but as being nonetheless permissible if they do not go so far as to convey a message of endorsement. (See 483 U.S. at pp. 346-348, 107 S.Ct. 2862 (cone. opn. of O'Connor, J.).) As we shall see below, under either view "accommodation" justifies exemptions targeted to religious organizations only when the law from which an exemption is made would otherwise interfere significantly with some religious activity.
Thus, in Corporation of Presiding Bishop, supra, 483 U.S. 327, 107 S.Ct. 2862, the majority approved an exemption for religious organizations from title VII's prohibition on religious discrimination, on the ground it served to "alleviate significant governmental interference with the ability of religious organizations to define and carry out their religious missions." (483 U.S. at p. 335, 107 S.Ct. 2862.) Justice O'Connor, concurring, stressed that "in order to perceive the government action as a permissible accommodation of religion, there must in fact be an identifiable burden on the exercise of religion that can be said to be lifted by the government action." (Id. at p. 348, 107 S.Ct. 2862 (cone, opn. of O'Connor, J.).) She concurred in the judgment because the exemption, designed to lift from religious organizations the "burden of refraining from discriminating on the basis of religion," would be perceived by an "objective observer . . . as an accommodation of the exercise of religion rather than as a Government endorsement *309 of religion." (Id. at p. 349, 107 S.Ct. 2862 (cone. opn. of O'Connor, J.)
In Wallace v. Jaffree, supra, 472 U.S. 38, 105 S.Ct. 2479, 86 L.Ed.2d 29, conversely, the court struck down a state statute authorizing public schools to have a period of silence for "`meditation or voluntary prayer.'" (Id. at pp. 41, 61, 105 S.Ct. 2479.) Rejecting the state's characterization of its law as "`a means for accommodating the religious and meditative needs of students,'" the majority reasoned that at the time of the statute's enactment "there was no governmental practice impeding students from silently praying for one minute at the beginning of each schoolday; thus, there was no need to `accommodate'. . . ." (Id, at p. 58, fn. 45, 105 S.Ct. 2479.) Justice O'Connor concurred here too, agreeing that the statute "lifts no state-imposed burden on the free exercise of religion, and accordingly cannot properly be viewed as an accommodation statute." (Id. at p. 84, 105 S.Ct. 2479 (cone. opn. of O'Connor, J.).)
Similarly, in Texas Monthly, the high court held that a sales tax exemption targeted at religious publications violated the establishment clause, in part because the exemption "does not remove a demonstrated and possibly grave imposition on religious activity." (Texas Monthly, supra, 489 U.S. at p. 19, fn. 8, 109 S.Ct. 890 (plur. opn. of Brennan, J.).) The Texas exemption, applicable to periodicals and books promulgating the teachings of a religious faith, and exclusively to such publications, "cannot reasonably be seen as removing a significant state-imposed deterrent to the free exercise of religion"; in that and other respects, the law conveyed a message of endorsement forbidden under the establishment clause. (Id. at p. 15, 109 S.Ct. 890.)
The high court's holdings, therefore, do not support the view of the majority that absence of a significant burden on free exercise does not matter when government chooses only to grant an exemption from otherwise applicable taxes or regulations.
The majority seeks support for its view that exemptions are inherently immune from advancement challenges in Justice White's opinion for the court in Corporation of Presiding Bishop, supra, 483 U.S. 327, 107 S.Ct. 2862, 97 L.Ed.2d 273. Justice White wrote that "[f]or a law to have forbidden `effects' under Lemon, it must be fair to say that the government itself has advanced religion through its own activities and influence." (Id. at p. 337, 107 S.Ct. 2862.) In the case at bench, he continued, "we find no persuasive evidence . . . that the Church's ability to propagate its religious doctrine . . . is any greater now than it was prior to the passage of the Civil Rights Act in 1964." (Ibid.)
Corporation of Presiding Bishop cannot reasonably be read as approving all exemptions favoring religious organizations regardless of whether they actually serve to alleviate substantial burdens on free exercise. There the general law at issue, title VII's prohibition on employment discrimination based on religion, did threaten "significant governmental interference with the ability of religious organizations to define and carry out their religious missions" (Corporation of Presiding Bishop, supra, 483 U.S. at p. 335, 107 S.Ct. 2862), and the majority opinion stands for nothing more than that government does not improperly advance religion in seeking to alleviate such interference. To the extent Justice White's opinion nevertheless might be read as establishing a per se rule equating exemptions to permissible accommodations, the court implicitly repudiated it two terms later in Texas Monthly. In that case, religious organizations were no better able to advance their publishing missions after the tax exemption at issue than they were before the sales tax itself was enacted, yet the court declined to characterize the exemption as a mere accommodation of religious freedom, instead finding the exemption impermissibly favored religious publications. (Texas Monthly, supra, 489 U.S. at p. 15, 109 S.Ct. 890; id. at p. 28, 109 S.Ct. 890 (cone, opn. of Blackmun, J.).)
*310 Because, as Justice O'Connor points out, most government assistance to religion could be characterized as a mere accommodation, the test of whether an exemption goes too far cannot be a simply formal one: it cannot be enough to observe that religious organizations granted exemption from an inconvenient or costly general law are no better off than they would have been had the general law not been enacted. Rather than rely on formalism, we must examine a special exemption for religious entities in context to determine whether it is designed and will serve to accommodate free exercise or, instead, to differentially promote and endorse religion or any particular religion. "To ascertain whether the statute conveys a message of endorsement, the relevant issue is how it would be perceived by an objective observer, acquainted with the text, legislative history, and implementation of the statute." (Corporation of Presiding Bishop, supra, 483 U.S. at p. 348, 107 S.Ct. 2862 (cone. opn. of O'Connor, J.).) Crucial to the analysis is whether or not the law was designed to lift a discernable significant burden on free exercise, for, where there is no such burden, the law "`provide[s] unjustifiable awards of assistance to religious organizations' and cannot but `conve[y] a message of endorsement' to slighted members of the community." (Texas Monthly, supra, 489 U.S. at p. 15, 109 S.Ct. 890, quoting Corporation of Presiding Bishop, supra, 483 U.S. at p. 348, 107 S.Ct. 2862 (cone. opn. of O'Connor, J.).) I believe an objective observer would see the statutes at issue here as going well beyond accommodation into the prohibited realm of preferential support and endorsement.

B. Landmark Designation and Religious Freedom
Sections 37361 and 25373 authorize cities and counties, respectively, to create and apply reasonable land use controls to protect the "special character or special historical or aesthetic interest or value" of places and buildings. More will be said later in this opinion about the value of preserving landmarks; suffice it here to note that landmark regulation has in common with much zoning and other land use regulation the "entirely permissible governmental goal" of "enhanc[ing] the quality of life by preserving the character and desirable aesthetic features of a city." (Penn Central Transp. Co. v. New York City (1978) 438 U.S. 104, 129, 98 S.Ct. 2646, 57 L.Ed.2d 631.)
Localities' efforts to shape and preserve the physical community through land use regulation do impose costs on property ownersin time, money and lost economic opportunities. As applied to religious individuals and institutions owning property, however, the incidental costs of such broadly applicable regulations have not generally been deemed constitutionally significant burdens on free exercise. Whether assessed under the lenient federal free exercise regime established in Employment Div., Ore. Dept. of Human Res. v. Smith (1990) 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (Smith ),[2] or under more stringent state or pre-Smith federal law, neutral land use regulations that merely add inconvenience or cost to a person's or group's religious practices do not unconstitutionally restrict freedom of religion.
As the United States Supreme Court recently explained in City of Boerne v. Flores (1997) 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624, rejecting a free exercise challenge to the impact of landmark restrictions on a church, "It is a reality of the modern regulatory state that numerous state laws, such as the zoning regulations at issue here, impose a substantial burden on a large class of individuals. *311 When the exercise of religion has been burdened in an incidental way by a law of general application, it does not follow that the persons affected have been burdened any more than other citizens, let alone burdened because of their religious beliefs." (Id, at p. 535, 117 S.Ct. 2157.)[3]City of Boerne, and the other cases cited in footnote 3, fit the general pattern, apparent even under pre-Smith law, of high court decisions holding that religion-neutral government regulations that incidentally burden religious individuals or groups by making their practices more costly or inconvenient do not thereby infringe adherents' freedom of religion.[4]
I recognize that "`[t]he limits of permissible state accommodation to religion are by no means co-extensive with the noninterference mandated by the Free Exercise Clause.'" (Corporation of Presiding Bishop, supra, 483 U.S. at p. 334, 107 S.Ct. 2862, quoting Walz v. Tax Commission, supra, 397 U.S. at p. 673, 90 S.Ct. 1409.) That religious individuals and groups may generally be required to bear the economic cost and inconvenience of compliance with neutral laws without violation of the free exercise clause does not necessarily imply that no relief from such costs is permissible under the establishment clause. Nonetheless, the two are related; the absence of even an arguably substantial burden on religious practices eliminates the chief justification for targeted religious exemptions. As one noted *312 scholar of the religion clauses, George Washington University's Ira Lupu, has written, "One of the strongest arguments for permissive accommodations is that they might be mandatory after all. In a world with no mandatory accommodations [i.e., after Smith ], this argument disappears. Government may burden religion incidentally, and may, by way of exemptions, seek to lift such a burden; as long as such burdens do not violate the Constitution, however, the case for lifting them from religious entities but not from those engaged in counterpart secular activity remains hard to fathom." (Lupu, The Trouble with Accommodation (1992) 60 Geo. Wash. L.Rev. 743, 771, fn. omitted.) Where a neutral law, such as a landmark regulation, imposes costs on a variety of individuals and organizations, but the costs to religious adherents do not rise to a level even arguably cognizable under free exercise principles, a legislative decision to target relief solely to religious adherents becomes difficult to justify as an accommodation of religious liberty.[5]
If the incidental costs of compliance with land use laws, including landmark restrictions, do not generally constitute substantial interference with free exercise justifying specially targeted exemptions, are there nonetheless some costs or impacts from landmarking that do threaten free exercise and call for accommodation? Courts and commentators agree that such conflicts between landmark laws and free exercise can occur, but the occasions are limited to a few types of circumstances and, in practice, have proven rare.
First, application of a landmark regulation to control the arrangement or appearance of the interior of a house of worship, or exterior features with religious significance, poses a significant threat of government interference in religious practices. (See Society of Jesus v. Boston Landmarks (1990) 409 Mass. 38, 564 N.E.2d 571, 573 [designation of church interior held impermissible restraint on freedom of worship under state Constitution].) Second, a significant burden would exist "[w]here a church can prove that unyielding enforcement of a landmark ordinance will result in a forced cessation of religious worship and practice in the landmarked building. . . ." (Weinstein, The Myth of Ministry vs. Mortar: A Legal and Policy Analysis of Landmark Designation of Religious Institutions (1992) 65 Temp. L.Rev. 91, 151 (hereafter Weinstein); see St. Bartholomew's Church v. City of New York, supra, 914 F.2d at pp. 355-356 [suggesting landmark restriction that prevented church from "continu[ing] its religious practice in its existing facilities" would be impermissible burden].)
Beyond these areas, however, the incidental costs and physical restrictions on repair and maintenance of property exteriors, the administrative cost and inconvenience of complying with landmark regulation, and the opportunity cost imposed by restraints on demolition of landmarked properties for commercial redevelopment are not constitutionally significant burdens on religious freedom. (Weinstein, supra, 65 Temp. L.Rev. at pp. 148-152; Nunez & Sidman, California's Statutory Exemption for Religious Properties from Landmark Ordinances: A Constitutional and Policy Analysis (1995-1996) 12 J.L. & Religion 271, 289-290 (hereafter Nunez & Sidman); *313 see St. Bartholomew's Church v. City of New York, supra, 914 F.2d at p. 355 [opportunity cost not constitutionally significant]; Open Door Baptist Church v. Clark County, supra, 995 P.2d at pp. 42-3 [same as to application fee for conditional use permit].) In Weinstein's summary, "[i]t seems clear that interior designation, and exterior designation that would constrain the `theological aspects of building design' or have the effect of forcing a church to cease religious worship at a given site because of physical or financial exigency, would constitute a burden. Conversely, the denial of permission for commercial development would not appear to constitute a burden." (Weinstein, supra, 65 Temp. L.Rev. at p. 148.)
Actual conflicts between religious practice and landmark restrictions arise infrequently. One survey of the reported cases of asserted conflict found that "most controversies involving historic preservation and religious organizations have little to do with the free exercise of religious beliefs. Instead, the arguments raised by religious institutions as property owners are more aptly viewed as secular in nature. For example, these owners often argue that existing facilities need expansion, maintenance and repair costs are too high, local land use regulation interferes with the opportunity to attain the `highest and best' (i.e., most profitable) use of the property, government red-tape is too burdensome, or the need for additional parking requires the demolition of adjacent buildings. All of these arguments are directly analogous to arguments raised by secular property owners in land use disputes, and are generally rejected by the courts." (Nelson, Remove Not the Ancient Landmark: Legal Protection for Historic Religious Properties in an Age of Religious Freedom Legislation (1999) 21 Cardozo L.Rev. 721, 729-730, fns. omitted.)
Not surprisingly, in light of both the rarity of situations in which landmarking actually restricts religious freedom and the flexibility built into most landmark laws, even cities with large numbers of landmarked religious buildings have seen few conflicts that could not readily be resolved administratively. In Philadelphia, with 139 landmarked religious properties, a 1989 study found religious institutions had applied for 127 building permits under the landmark ordinance's standards. Only one was denied, and that application was subsequently withdrawn. Most of the 126 approvals came within one week of application. (Weinstein, supra, 65 Temp. L.Rev. at p. 111.) In New York City, with 211 religious institutions designated as landmarks or in historic districts, a 1991 study found all but nine of 423 applications for permits were approved. Two were partially approved, and two more were resolved by approval of subsequent proposals. (Id. at p. 112.)
With this background understanding of the limited constitutional conflict between landmark laws and religious freedom, we can examine the text and history of the California exemption to see if it is designed as a reasonable accommodation of religion or as an unjustified and preferential benefit to religious organizations.

C. Text and History of California's Religious Entities Exemption
Section 25373(d) provides that counties' authority to control the use and appearance of historic properties, granted in subdivision (b) of the same section, "shall not apply to noncommercial property owned by any association or corporation that is religiously affiliated and not organized for private profit, whether the corporation is organized as a religious corporation, or as a public benefit corporation, provided that both of the following occur: [¶] (1) The association or corporation objects to the application of the subdivision to its property. [¶] (2) The association or corporation determines in a public forum that it will suffer substantial hardship, which is likely to deprive the association or corporation of economic return on its property, the reasonable use of its property, or the appropriate *314 use of its property in the furtherance of its religious mission, if the application is approved." Section 37361(c) places the same restriction on cities' historic preservation authority.
Although the statutes require a self-determination of hardship to be made in a "public forum," the nature of that forum is not further specified. (§§ 25373(d)(2), 37361(c)(2).) No application for exemption need be made to a governmental body. Nor does either statute provide for any governmental or judicial review of the religious entity's hardship declaration; indeed, both statutes expressly disavow any authorization for local legislative bodies to "override the determination made pursuant to paragraph (2)." (Gov.Code, §§ 25373, subd. (e), 37361, subd. (d).) The laws, therefore, must realistically be seen as blanket exemptions for noncommercial properties owned by religious entities or, more precisely, as blanket grants to such organizations of the power to exempt their own noncommercial properties from local historic preservation regulations.[6]
Neither statute defines "noncommercial," but the opposite term, "commercial," is a familiar one in land use law. As commonly employed in zoning regulations, "commercial" denotes a category of real property use, standing in distinction to such other common use zones as residential, industrial, and agricultural. (See, e.g., Williams, Cal. Zoning Practice (Cont.Ed.Bar 2000 supp.) §§ 6.2-6.3, pp. 287-295 [zone definition charts for the City of Los Angeles].) "Noncommercial property" would thus appear to include property used for residential (including multipleunit rentals), industrial, and agricultural purposes. Moreover, while the property must be owned by a religiously affiliated entity, nothing in the statutes requires that it be in use by the organization; nor do the statutes exclude property leased to others. The exemption could therefore be applied to property owned by a church but leased to a nonreligious individual or corporation for industrial or residential use.
Whether or not the property is being used for worship or other religious practices at the time of the self-declared exemption, nothing in the statutes requires that it be so used after exemption, or even that it remain in the religious entity's ownership. Under sections 25373(d) and 37361(c), then, a religiously affiliated organization could, for example, declare exempt a historic building still suitable for and in use as a house of worship, tear it down, and build a modern office building for sale on the commercial market.
Finally, even when the building is in use for worship or other religious practice, and the organization intends to continue that use, the statutes call for only an unreviewable declaration of economic impact. Thus, the exemption could be invoked where application of the landmark regulation would impose only incidental costs and inconvenience on the religious entity and would not prevent the property's continued religious use. Under sections 25373(d) and 37361(c), a religiously affiliated organization that simply did not want to go through the permit process to make minor changes to a building, or wished to save some money by using inexpensive but anachronistic materials to rebuild an exterior feature, could exempt itself from the landmark regulation process despite the lack of any demonstrable threat to freedom of religion.
The permanent provisions in sections 25373 and 37361 allowing religious entities self-exemption were added in 1994, by Assembly Bill No. 133 (1993-1994 Reg. Sess.). (Stats.1994, ch. 1199, §§ 1, 2 (Assem. *315 Bill No. 133).) The history of these amendments bears out what the text indicates, that they were designed to favor religious organizations with regulatory relief much broader than necessary for protection of religious freedom.
"The Archdiocese of San Francisco, as part of a cost-cutting move, planned to close nine parish churches." (Nunez & Sidman, supra, 12 J.L. & Religion at p. 275.) The archdiocese, facing millions of dollars in seismic retrofitting costs as well as declining attendance in some parish churches, had systematically evaluated the market value and "highest and best use" of its properties, and decided on a consolidation plan. (Fernandez et al., Church for Sale?, S.F. Examiner (Aug. 3, 1995) p. Al.) However, the archbishop's "controversial plan to consolidate the city's 54 parishes . . . sparked a firestorm of protest in churches across the city" (Lattin, Altars in Escrow, S.F. Chronicle (Mar. 2, 1997) p. 1) and "`arous[ed] preservationists' fears that [the churches might] be sold, demolished, or remodeled'" (Comment, Holy War: In the Name of Religious Freedom, California Exempts Churches from Historic Preservation (1996) 37 Santa Clara L.Rev. 213, 229, fn. omitted). "In response to the San Francisco Catholic Archbishop's desire to close and demolish churches, [Assembly] Speaker [Willie] Brown amended AB 133 . . . so that cities and counties could not apply special conditions or regulations to protect historic properties owned by religious organizations." (Assem. Com. on Local Gov., Concurrence in Sen. Amends., Assem. Bill No. 133 (1993-1994 Reg. Sess.) as amended Aug. 26, 1994, p. 2.) The bill thus had its genesis in a specific conflict between the San Francisco Catholic Archdiocese, and parishioners and preservationists in San Francisco, although ultimately wider support came from a number of San Francisco churches and church groups from around the state, and wider opposition from an array of historic preservation organizations and local governments. (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 133 (1993-1994 Reg. Sess.) as amended Aug. 26, 1994, pp. 2-3.)[7]
As this history and the law's text show, the amendments to sections 25373 and 37361 were designed to do much more than protect religious adherents' right to worship and practice their religions as they choose in historic buildings, or to remodel the interior of such structures for a different use, retrofit historic buildings for earthquake safety, or abandon historic houses of worship that, for physical or financial reasons, can no longer be used for that purpose. (Indeed, San Francisco's landmark ordinance does not restrict alterations to the interiors of privately owned structures or prohibit the demolition of landmarked properties; nor is any special approval required for ordinary maintenance and repairs, or for work needed to comply with seismic retrofit regulations, or for work needed to correct an unsafe condition. (S.F. Planning Code, §§ 1005, subd. (e)(2)-(4), 1006.6, subd. (b), 1007.)[8] *316 Rather, the amendments' design and effect were to award religious organizations the unique ability to manipulate their property holdings without regard for landmark regulations, by altering, demolishing, and selling properties, if they choose, for maximum economic benefit and without the incidental cost and delay attendant on obtaining special permits.

D. Unrestricted Self-exemption Is Not a Reasonable Measure for Accommodation of Religious Freedom
"[E]nactments that attempt wholly to exempt churches from landmark regulationssuch as owner consent provisions [or] barring designation of churches . . .  would fail an Establishment Clause challenge because they are not permissible accommodations of free exercise, but rather unconstitutional attempts to benefit religious institutions over secular institutions that are similarly situated. By contrast, legislative enactments that accommodate core religious values, such as exemption from interior designation and hardship provisions for nonprofit institutions generally, would pass constitutional muster." (Weinstein, supra, 65 Temp. L.Rev. at p. 157, fn. omitted.)
The Legislature could have responded to the San Francisco controversy over church closings, and any similar problems in other cities, by requiring that all local landmark laws have hardship provisions permitting approval for alteration of a historic building when necessary to continued use or rehabilitation. (See, e.g., San Jose Mun. Code, § 13.48.260 [permit for noncomplying work may be issued if denial "would cause immediate and substantial hardship on the applicant because rehabilitation in accordance with the chapter is infeasible from a technical, mechanical, or structural standpoint, or if the economics of rehabilitation in accordance with this chapter would require an unreasonable expenditure in light of the feasible uses of such property"]; Berkeley Mun.Code, § 3.24.270 [same, "if the applicant presents clear and convincing evidence to the commission that such disapproval will work immediate and substantial hardship because of conditions peculiar to the particular structure or feature involved, and that failure to disapprove the application will be consistent with the purposes of this chapter"].) Alternatively, the Legislature might have mandated a hardship exemption particularly tailored to religious and charitable institutions. Columbus, Ohio, for example, provides relief to any nonprofit *317 organization that can show "it is infeasible to financially or physically achieve its charitable purposes while conforming to the pertinent architectural standards and guidelines." (Columbus City Code, tit. 31, ch. 3116.16, subd. (3) (enacted 1989), quoted in Weinstein, supra, 65 Temp. L.Rev. at p. 105 [also discussing targeted hardship provisions in both New York City and Buffalo, New York, landmark ordinances].)
Instead, the Legislature created an exemption for religious organizations only, and made the exemption available through the organization's own, unreviewable, declaration of hardship. Self-exemption was not necessary either to protect religious freedom, as we have seen, or to guard against government entanglement in religious affairs in the permit process itself. A true hardship exemption, available on application and based on reviewable agency findings, would not involve the administering agency in any intrusive inquiry into religious affairs or otherwise entangle the local government in religion; the question before the planning commission or other board deciding such an application is not whether the organization's use of the property is truly religiousthat should be left to the sincerely held tenets of the organization itselfbut only whether the physical and economic circumstances justify a variance from the ordinary requirements of historic preservation.[9]
Not only is self-exemption unjustified by any need to prevent government interference with religious affairs, but by effectively abdicating exercise of a government function and delegating it to a private religious group, the self-exemption feature of sections 25373(d) and 37361(c) actually tends to create a "forbidden `fusion of governmental and religious functions.'" Board of Ed. of Kiryas Joel Village School Dist. v. Grumet, supra, 512 U.S. at p. 702, 114 S.Ct. 2481.) As with New York's delegation of school district powers to a religious group, held unconstitutional in Grumet, here the state has effectively placed the government power to determine applicability of land use laws in the hands of groups "chosen according to a religious criterion." (Id. at p. 698, 114 S.Ct. 2481.) Like Massachusetts's delegation to churches of veto power over nearby liquor licenses, held unconstitutional in Larkin v. Grendel's Den, Inc. (1982) 459 U.S. 116, 103 S.Ct. 505, 74 L.Ed.2d 297, our self-exemption provision "substitutes the unilateral and absolute power of a church for the reasoned decisionmaking of a public legislative body acting on evidence and guided by standards, on issues with significant economic and political implications." (Id. at p. 127, 103 S.Ct. 505.)
An unnecessary blanket exemption for religious property owners from the constraints of landmark regulation, moreover, actually promotes the missions of religious organizations relative to the sometimes competing missions of secular educational and persuasive organizations. "Exempting religious institutions from landmark *318 designation creates the potential for significantly advancing religious ideas over competing secular ideas. If St. Bart's [the plaintiff church in St. Bartholomew's Church v. City of New York, supra, 914 F.2d 348] is free to reap millions of dollars from the commercial development of its property and then apply those funds to support its religious and charitable programs, but secular charitable institutions must comply with the landmark ordinance and so are denied access to funds derived from property development, then religious institutions and their ideas are given a significant advantage by government action. Denying government the right to prefer religion over secularism lies at the core of the Lemon test. . . ." (Weinstein, supra, 65 Temp. L.Rev. at p. 157, fn. 405.)
An objective observer familiar with the text, history, and social context of the self-exemption power granted in sections 25373(d) and 37361(c) would thus perceive it not as a reasonable attempt to prevent local government interference in religious affairs or to lift a significant burden on religious liberty, but as the unjustifiably broad award, to religiously affiliated property owners, of a unique and valuable privilegethe privilege of determining their own properties' subjection to generally applicable land use laws. Such favoritism in the political distribution of valuable privileges "cannot but `conve[y] a message of endorsement' to slighted members of the community." (Texas Monthly, supra, 489 U.S. at p. 15, 109 S.Ct. 890.) The state's relative endorsement of religious organizations' missions "is impermissible because it sends the ancillary message to . . . nonadherents `that they are outsiders, not full members of the political community, and an accompanying message to adherents that they are insiders, favored members of the political community.'" (Santa Fe Independent School Dist. v. Doe (2000) 530 U.S. 290, 309-310, 120 S.Ct. 2266, 2279, 147 L.Ed.2d 295.)[10]

II. Generality of Benefits

A. The Role of Evenhandedness
Even when the government relief accorded religious institutions cannot be characterized as an accommodation of free exercise, the proper governmental stance of neutrality toward religion may manifest itself in an evenhanded provision of benefits to religious and secular institutions alike. This is true not only when the scope of benefits approaches universality (see Everson v. Board of Education, supra, 330 U.S. at pp. 17-18, 67 S.Ct. 504 [citing such general government services as police and fire protection and sewage disposal] ), but also, as seen below, when religious institutions are included in a limited set of recipients rationally defined by a secular governmental purpose.
In Walz v. Tax Commission of New York City, supra, 397 U.S. 664, 90 S.Ct. 1409, 25 L.Ed.2d 697 (Walz ), the high court considered a New York law exempting from property taxation corporations and associations "`organized exclusively for the moral or mental improvement of men and women, or for religious, bible, tract, charitable, benevolent, missionary, hospital, infirmary, educational, public playground, scientific, literary, bar association, medical society, library, patriotic, historical or cemetery purposes.'" (Id. at p. *319 667, fn. 1, 90 S.Ct. 1409.) In rejecting an establishment clause challenge to the exemption, the court relied prominently on the generality with which it had been offered: "The legislative purpose of the property tax exemption is neither the advancement nor the inhibition of religion; it is neither sponsorship nor hostility. New York, in common with the other States, has determined that certain entities that exist in a harmonious relationship to the community at large, and that foster its `moral or mental improvement,' should not be inhibited in their activities by property taxation or the hazard of loss of those properties for nonpayment of taxes. It has not singled out one particular church or religious group or even churches as such; rather, it has granted exemption to all houses of religious worship within a broad class of property owned by nonprofit, quasi-public corporations which include hospitals, libraries, playgrounds, scientific, professional, historical, and patriotic groups. The State has an affirmative policy that considers these groups as beneficial and stabilizing influences in community life and finds this classification useful, desirable, and in the public interest." (Id. at pp. 672-673, 90 S.Ct. 1409.)
In Texas Monthly, supra, 489 U.S. 1, 109 S.Ct. 890, 103 L.Ed.2d 1, again facing the question whether a tax exemption benefiting religious organizations violated the establishment clause, the court distinguished the evenhanded exemption of Walz from the narrow religious benefit provided by the Texas statute: "In [Walz and other cases], . . . we emphasized that the benefits derived by religious organizations flowed to a large number of nonreligious groups as well. Indeed, were those benefits confined to religious organizations, they could not have appeared other than as state sponsorship of religion. . . ." (Texas Monthly, supra, at p. 11, 109 S.Ct. 890 (plur. opn. of Brennan, J.).) In contrast, "Texas' sales tax exemption for periodicals published or distributed by a religious faith and consisting wholly of writings promulgating the teaching of the faith lacks sufficient breadth to pass scrutiny under the Establishment Clause. Every tax exemption constitutes a subsidy that affects nonqualifying taxpayers, forcing them to become `indirect and vicarious "donors."' [Citations.] Insofar as that subsidy is conferred upon a wide array of nonsectarian groups as well as religious organizations in pursuit of some legitimate secular end, the fact that religious groups benefit incidentally does not deprive the subsidy of the secular purpose and primary effect mandated by the Establishment Clause. However, when government directs a subsidy exclusively to religious organizations that is not required by the Free Exercise Clause and that either burdens nonbeneficiaries markedly or cannot reasonably be seen as removing a significant state-imposed deterrent to the free exercise of religion, as Texas has done . . ., it `provide[s] unjustifiable awards of assistance to religious organizations' and cannot but `conve[y] a message of endorsement' to slighted members of the community." (Id. at pp. 14-15, 109 S.Ct. 890, fn. omitted.) The main concurring opinion agreed that "by confining the tax exemption exclusively to the sale of religious publications, Texas engaged in preferential support for the communication of religious messages." (Id. at p. 28, 109 S.Ct. 890 (cone. opn. of Blackmun, J.).)
In a variety of other factual contexts, as well, the high court has considered the evenhandedness, or generality, of benefits an important factor in its establishment clause analysis. Besides Walz and Texas Monthly, one may look to such cases as Rosenberger v. Rector and Visitors of Univ. of Va. (1995) 515 U.S. 819, 839-840, 115 S.Ct. 2510, 132 L.Ed.2d 700 (holding that use of a student activity fund to pay costs of a Christian student publication would not violate the establishment clause, because the fund was used to create an open forum for speech and publication, evenhandedly supporting a wide variety of student publications); Estate of Thornton *320 v. Caldor, Inc. (1985) 472 U.S. 703, 710, footnote 9, 105 S.Ct. 2914, 86 L.Ed.2d 557 (law requiring employers to give religious employees their Sabbath days off was held unconstitutional, in part because it gives Sabbath observers a "valuable right" not provided to employees with "legitimate, but nonreligious, reasons" for wanting a particular day off); Mueller v. Allen (1983) 463 U.S. 388, 397, 103 S.Ct. 3062, 77 L.Ed.2d 721 (state tax deduction for educational expenses was upheld, in part because its benefits extend to families with children in public schools and nonsectarian private schools); and Committee for Public Education v. Nyquist (1973) 413 U.S. 756, 794, 93 S.Ct. 2955, 37 L.Ed.2d 948 (tax benefits were held unconstitutional, in part because they would go primarily to parents of children in sectarian private schools).
Just last term, in Mitchell v. Helms, supra, 530 U.S. 793, 120 S.Ct. 2530, the plurality, concurring, and dissenting justices all recognized the important role of evenhandedness in assessing an establishment clause challenge. Though the justices disagreed sharply as to whether evenhandedness in the distribution of benefits is, by itself, a sufficient condition of constitutionality under the establishment clause, all agreed it is an important, in some cases necessary, condition of constitutionality.[11]
More specifically, the evenhandedness aspect of the neutrality principle bars government from engaging in "religious gerrymanders." (Walz, supra, 397 U.S. at p. 696, 90 S.Ct. 1409 (cone. opn. of Harlan, J.).) With the exception of relief reasonably needed to alleviate substantial government burdens on free exercise, religious adherents and institutions must neither be denied nor granted government benefits on the basis of religion itself. In the absence of a demonstrable need for special accommodation of religion, religious institutions must not be singled out for special treatment, though they may, of course, be included in rationally drawn regulatory groups. "In any particular case the critical question is whether the circumference of legislation encircles a class so broad that it can be fairly concluded that religious institutions could be thought to fall within the natural perimeter." (Ibid.)
Two recent cases from the same federal district court, Renzi v. Connelly School of Holy Child, supra, 61 F.Supp.2d 440 (Renzi ), and Concerned Citizens of Carderock v. Hubbard (D.Md.2000) 84 F.Supp.2d 668 (Concerned Citizens ), illustrate the role of generality in establishment clause challenges to land use law exemptions.
In Renzi, a county zoning ordinance that required property owners to obtain a special exception for nonconforming uses in residential zones exempted any private school located on the grounds of a "church or religious organization." (Renzi, supra, 61 F.Supp.2d at p. 442.) In finding an establishment clause violation, the court *321 relied both on the lack of a substantial burden needing accommodation (id. at pp. 446-447) and on the ordinance's unnecessary limitation to schools on religious property, a lack of evenhandedness the court concluded violated the principle of government neutrality. "In the final analysis, it is on this principle that [the exemption] founders because it fails to be neutral in a context where neutrality is possible. By favoring sectarian schools over most other non-profit private educational institutions, it belies any secular purpose and has a principal effect of advancing religion." (Id. at p. 444, fn. omitted.)
Concerned Citizens involved a different part of the same county zoning ordinance, setting out a lengthy list of nonresidential uses permitted in the county's RE 2 zones. These included "churches . . . and other places of worship," but also included such diverse institutions as embassies, small bed and breakfasts, group homes, child and adult daycare facilities, adult foster care homes, libraries and museums. Non-permitted uses could be located in the zone only if they obtained a special exception. (Concerned Citizens, supra, 84 F.Supp.2d at p. 670 & fn. 2.) In finding the ordinance passed establishment clause muster, the court again relied on generality as a measure of neutrality, concluding in this case that the ordinance "grants a benefit . . . to a wide array of `nonsectarian [uses] as well as religious [uses] . . .,' [Texas Monthly, supra,] 489 U.S. at 14, 109 S.Ct. 890, 103 L.Ed.2d 1, consistent with its purpose of preserving single family residential neighborhoods. The Ordinance envelops a broad circle of beneficiaries designating some 41 categories of permitted uses in the RE-2 zone, into which `churches . . . and other places of religious worship' naturally fit." (Id. at p. 674, first ellipsis added.) Renzi was distinguished as involving a law "the operative characteristic [of which] was religion." (Concerned Citizens, supra, at p. 675, italics omitted.)
Both cases seem to me correctly decided, and, as discussed below, I find the present case more like Renzi than Concerned Citizens.[12] Here, too, the law's operative characteristic is religion, for sections 25373(d) and 37361(c) provide the valuable privilege of self-exemption from landmark laws solely to "religiously affiliated" corporations and associations. Here, too, the blanket grant of this self-exemption power was unnecessary to prevent government interference with, or to alleviate a significant burden on, the free exercise of religion. Like the ordinance in Renzi, supra, 61 F.Supp.2d at page 444, our law "fails to be neutral in a context where neutrality is possible."

B. Sections 25373(d) and 37361(c) Create a Religious Gerrymander
To state the obvious, sections 25373(d) and 37361(c) do not distribute government benefits evenhandedly to the religious and nonreligious alike; the self-exemption power they provide is given only to "religiously affiliated" associations and corporations. Since, as we have seen in part I, ante, the unrestricted grant of self-exemption cannot be justified as needed to alleviate a significant burden on, or prevent government interference in, the free exercise of religion, no reason appears for restricting relief to religious property owners.[13] Without such reason or justification, *322 such a law granting valuable privileges only to religious organizations advances those organizations' missions relative to nonreligious counterparts and thus conveys a message of comparative government endorsement of religious viewpoints. While evenhandedness may not itself guarantee constitutional neutrality, a lack of evenhandedness, without a need for the discrimination, is a departure from the neutral stance required of government.
The majority appears to argue that the restriction of benefits to religious organizations under sections 25373(d) and 37361(c) is constitutionally insignificant. It quotes a single sentence from Corporation of Presiding Bishop: "Where, as here, government acts with the proper purpose of lifting a regulation that burdens the exercise of religion, we see no reason to require that the exemption come packaged with benefits to secular entities." (Corporation of Presiding Bishop, supra, 483 U.S. at p. 338, 107 S.Ct. 2862.)
In context, however, that remark says little about the role of a lack of evenhandedness in a case like this one. One must note, first, that the high court did not say that an exemption's singling out of religious organizations was always permissible, only that it was not "per se invalid." (Corporation of Presiding Bishop, supra, 483 U.S. at p. 338, 107 S.Ct. 2862, italics omitted.) The court, indeed, observed that on at least two prior occasions it had given weight to the breadth or narrowness of an exemption. (Ibid., citing id. at p. 333, fn. 11, 107 S.Ct. 2862, citing Mueller v. Allen, supra, 463 U.S. at p. 397, 103 S.Ct. 3062, and Committee for Public Education & Religious Liberty v. Nyquist, supra, 413 U.S. at p. 794, 93 S.Ct. 2955.) Second, as the quoted sentence makes explicit, Corporation of Presiding Bishop was a case in which the general law at issue, title VII's bar on religious discrimination in the workplace, in fact placed a significant burden on religious organizations' religious freedom. Indeed, the prohibition against religious discrimination in employment, by its nature, uniquely burdened the exercise of religion, because only religious employers were likely to suffer significant impairment of their legitimate activities if bound by this prohibition of title VII. Congress's decision to exempt only religious employers from the prohibition can, therefore, readily be characterized as a neutral measure to prevent interference with religion. Where, as here, however, the costs of a regulation fall more generally on secular and religious institutions, the lack of evenhandedness in granting relief by exemption becomes much more significant.
Second, the majority attempts to distinguish Texas Monthly, a sales tax exemption case, as involving a forced subsidy from nonexempt taxpayers to sexempt religious publishers, relying on the Texas Monthly plurality's observation that "[e]very tax exemption constitutes a subsidy that affects nonqualifying taxpayers, forcing them to become `indirect and vicarious "donors."'" (Texas Monthly, supra, 489 U.S. at p. 14, 109 S.Ct. 890.) In contrast, the majority asserts, "an exemption from landmark status does not create a subsidy for religious activity by forcing other property owners to be vicarious donors." (Maj. opn., ante, 102 Cal.Rptr.2d at p. 295, 13 P.3d at p. 1136.)
*323 In my view, no salient distinction appears between the manner in which sections 25373(d) and 37361(c) favor religious property owners over their nonreligious counterparts and the manner in which the Texas sales tax exemption favored religious publishers over their nonreligious counterparts. None of the Texas Monthly opinions suggest that, under Texas law, a specified dollar amount had to be raised each year from taxes on sales of books and magazines, so that the cost of the religious exemption would have to be borne exclusively by other publishers. Rather, the involuntary donation effect was described as indirect; to the extent the exemption for religious publications deprived Texas of tax revenue, the state would have to raise it from other sources or reduce the cost or amount of public services funded by the tax. The subsidy to religious taxpayers would be borne by other, nonreligious taxpayers, by the general population of state service recipients, or by both.
Similarly, California has required that localities subsidize religious property owners with a valuable privilegethe power to exempt themselves from costly land use regulations. If a city, prevented by the exemption from preserving the historical and cultural value of a structure, wishes to make up as well as possible the historical and cultural deficit thereby created, it will have to designate additional landmarks and/or apply its restrictions that much more strictly to already designated buildings. Alternatively, the city may choose to forgo that amount of the public good created by historical preservation. Either way, nonadherents of the religioneither other historic property owners, the citizenry as a whole, or bothbecome involuntary donors to the religious organization's mission.
To the extent, then, that land use regulation is understood to create a public good, or prevent a public harm, it stands for present purposes in a comparable position to the collection of tax revenue. "Honoring religion's negative claims . . . also may produce forced subsidies. Tax exemption shifts burdens from some to others, and exemptions from regulatory schemes result in uncorrected harms of the sort with which the scheme is concerned. Exemption for religious entities from land-use regulation, for example, inescapably imposes social and economic costs upon others in the community." (Lupu, The Trouble with Accommodation, supra, 60 Geo. Wash. L.Rev. at pp. 750-751, fn. omitted.)
Perhaps, then, the majority is relying on an unarticulated belief that historic preservation is not a sufficiently important public good, and the loss of landmarks not a significant civic threat, for Texas Monthly's subsidy rationale to be applicable. If so, I disagree. Particularly in California, with its relative paucity of historic buildings and its population perpetually rich in newcomers, preserving what landmarks we have is all the more vital to creating and continuing a sense of community. As Winston Churchill observed, "We shape our buildings; thereafter they shape us." (Quoted in Simpson's Contemporary Quotations (Houghton Mifflin 1988).)
Preservation of historic buildings and sites benefits the citizens in obvious ways by conserving aesthetically pleasing features of the urban landscape and by bolstering aspects of the local economy, such as tourism, that are dependent on the city's distinctive character. Beyond that, landmarks are crucial to the coherence of the community itself. "In essence, `we strive to save our historic and architectural heritage simply because . . . it has become part of us.' It has become so on two levels, the individual and the communal. . . . [¶] . . . At the most basic level, a landmark can help physically orient a person in his environment; we oftentimes use landmarks to find our way about a city. A landmark, therefore, may be an important part of the `legible' cityscape. In addition, a landmark can serve to orient a person in her historical or cultural environment. . . . [¶] More importantly, a *324 landmark can impact an individual psychologically. Buildings function as symbols, imparting meaning beyond their historical context or architectural characteristics. [¶] Preservation saves these meanings and associations. . . . [¶] On a greater scale, the cumulative effect of the icon-individual subjective experience becomes the basis for a shared communal identity with roots in the past, a present manifestation, and a foundation for the future. . . . [¶] Aside from transmitting knowledge of the past, landmark preservation functions to provide a basis for a separate, presently shared community experience. For example, an individual who has recently moved to Boston need not be specifically aware of Fenway Park's storied past, of the great baseball players who have competed there over the years, to appreciate its value as an icon in the community. By doing so, she has an immediate tie to individuals who are knowledgeable about the stadium's past, or who have resided in the community for many years. This is one, admittedly trivial, example, but taken as a whole, landmarks can serve to presently facilitate communal bonds, and thereby stability, among a spectrum of residents who might otherwise have little in common." (Nunez & Sidman, supra, 12 J.L. & Religion at pp. 311-313, fns. omitted.)
Texas Monthly's rationale, therefore, appears fully applicable here. The Legislature's unjustifiably unequal treatment of religious and nonreligious property owners forces the latter, along with the citizenry as a whole, to subsidize the former's missions. The California law "fails to be neutral in a context where neutrality is possible." (Renzi supra, 61 F.Supp.2d at p. 444, fn. omitted.)
Again, this is not to suggest that every exemption for a religious landmark would properly be regarded as an unconstitutional forced subsidy of religion. Where unyielding application of landmark restrictions would prevent a religious group from continuing to worship as it chooses in the landmarked building, for example, an exemption, even if targeted to a particular religious group, would be seen not as favoritism but as a reasonable accommodation of religious freedom. Nor would any establishment clause problem be presented by a hardship exemption designed and applied more generally to a rationally defined set of nonprofit religious, philosophical, charitable, educational, and civic organizations. (See Texas Monthly, supra, 489 U.S. at pp. 15-16,109 S.Ct. 890.) Unfortunately, the Legislature took neither of these approaches in sections 25373(d) and 37361(c), instead granting solely to religious organizations a unique and unjustified power of self-exemption.

Conclusion
Part I of this opinion's discussion measured the self-exemption provisions of sections 25373(d) and 37361(c) along the axis of advancement versus accommodation of religion, concluding that the grant of an unrestricted, unreviewable privilege of exempting one's own property from historic preservation regulations could not reasonably be characterized as mere accommodation of free exercise. Rather, this drastically overbroad measurewhich would, for example, allow a religious organization with a historic and still usable house of worship to demolish and sell it for commercial development, without even the waiting period for preservation efforts most landmark laws provide, simply in order to maximize the economic value of its real estate portfoliocould be seen by an objective observer only as comparatively advancing and promoting the missions of religious organizations by abdicating to them the government function of administering generally applicable land use regulations.
In part II, I measured the neutrality of the same provisions along a different axis, that of evenhandedness or generality in the granting of government benefits. Because they cannot be reasonably characterized as measures necessary for the accommodation of religious exercise, sections *325 25373(d) and 37361(c) could survive scrutiny in this dimension only if the class of recipients of the government benefit bestowed was rationally defined by a secular legislative purpose. A more general hardship exemption, such as those contained in many local landmark laws, would meet this criterion even if some of its benefits were to go to religious organizations, since relief of property owners from unusual regulatory hardships would be a proper secular goal. But because religious organizations are not the only property owners that occasionally need relief from strict enforcement of landmark regulations in order to continue using their structures, the grant of a self-exemption privilege solely to religiously affiliated corporations and associations cannot be deemed neutral along this axis either.
However one looks at them, in short, the self-exemption provisions of sections 25373(d) and 37361(c) fail to display the neutrality toward religion required of the government under the establishment clause. For this reason, I dissent.
GEORGE, C.J., concurs.
NOTES
[1] The free exercise and establishment clauses of the First Amendment provide: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof. . . ."
[2] California Constitution, article I, section 4: "Free exercise and enjoyment of religion without discrimination or preference are guaranteed. This liberty of conscience does not excuse acts that are licentious or inconsistent with the peace or safety of the State. The Legislature shall make no law respecting an establishment of religion."
[3] Unless otherwise indicated, all statutory references are to the Government Code.
[4] Various amici curiae claim that the exemption denies equal protection and violates article XI, section 11 of the California Constitution by delegating municipal functions to private organizations and by providing payments to religious organizations. Although these arguments were made below, the first is outside the question presented in the petition for review (Cal. Rules of Court, rule 28(e)(2)), and plaintiffs no longer rely on and have not made any argument in this court addressed to the second other than an argument that delegation of the power to exempt properties from landmark designation excessively entangles church and state in violation of the establishment clause. Therefore, we do not address them. (See San Franciscans for Reasonable Growth v. City and County of San Francisco (1989) 209 Cal.App.3d 1502, 1515, fn. 10, 258 Cal.Rptr. 267.)
[5] Because this action arises as a facial challenge to the exemption (§§ 25373, 37361), the record made in the superior court includes no evidence that application of local landmark preservation ordinances to noncommercial property owned by religious organizations burdens free exercise of religion. Amici curiae Pacific Union Conference of Seventh-Day Adventists et al request judicial notice of documents that were addressed to the Legislature and the Governor encouraging passage and signing of Assembly Bill No. 133, which permanently added the exemption to sections 25373 and 37361.

Ironically, since San Francisco is now a plaintiff seeking to overturn the exemption, one of the documents is a letter from Willie Lewis Brown, Jr., then Speaker of the Assembly and now Mayor of San Francisco, to the Governor, and another is a letter from Frank M. Jordan, then Mayor of San Francisco, to the Assembly Local Government Committee. Each communication suggested that landmark designation had imposed an indirect burden on the owners' ability to carry out their religious mission. Inasmuch as these documents may be considered legislative history and are authenticated, we may take judicial notice of them. (Evid.Code, §§ 452, 459.) Therefore, since the documents are relevant to the purpose of the exemption and to whether the Legislature could reasonably believe that imposing landmark status on noncommercial property owned by a religious entity could burden the owners' free exercise of religion, the request for judicial notice is granted.
The documents contain the following representations.
Speaker of the Assembly Brown, who was the author of Assembly Bill No. 133, stated that religious congregations were facing difficult decisions on how best to use limited financial resources to carry out their religious missions and, particularly in San Francisco, were faced with very high seismic retrofit costs for older buildings that had been or were subject to landmark designation but could not qualify for assistance from the Federal Emergency Management Agency (FEMA). In support of this assertion, he attached to his letter a photo of the Korean United Methodist church building that the congregation had outgrown and had decided to sell. A willing buyer was located, but withdrew the offer when the board of supervisors voted to designate the building a landmark.
A second building, St. Mark's Lutheran Church, had been designated a landmark. Its 300-person congregation faced seismic retrofit expenses of up to $5 million, which could be substantially reduced if it rebuilt the tower and campanile of the structure, an action not permitted for a landmark structure. The church also owned and operated a residential tower for low-income seniors. To retrofit the church, either the residential tower or the church building itself would have to be sold. Either sale would disrupt the ability of the church to fulfill its religious mission.
The third structure was Sacred Heart Catholic Church, originally built for 10,000 parishioners, which then had a congregation of 180 people. Damaged in the 1989 Loma Prieta earthquake, the church faced repair and retrofit costs estimated at $5 million, and was ineligible for FEMA assistance. Funds from the congregation were used to subsidize children in the school operated by the church. The church had decided it would be best to replace the structure with a smaller chapel, at which point the board of supervisors had voted to designate the building a landmark. The church believed it would have been bankrupt if the landmark designation had not been suspended by the temporary legislative moratorium enacted the year before Assembly Bill No. 133 was proposed.
Mayor Jordan emphasized the "disproportionate" financial burden associated with landmark designation imposed on religious communities that are ineligible for governmental assistance. He also asserted that "landmarking laws erode the ability of religious leaders to exercise their fiduciary responsibilities in light of the pastoral mission."
The third document is a Senate Rules Committee digest and report prepared for the third reading of Assembly Bill No. 133 by the bill's author. The report stated that in the prior year, the Catholic Archbishop of San Francisco had expressed concern about his ability to expand church sites if local officials adopted historic preservation regulations. The arguments in support of the bill again asserted the disproportionate financial burden on religious communities by landmarking and the unavailability of governmental assistance to relieve that burden. The arguments against the bill included its preemptive effect on local ordinances and the ability of local government to designate landmarks and historic districts.
[6] The dissent construes "noncommercial" as referring to all forms of real property that are not zoned commercial. In context, it seems clear, however, that the Legislature had in mind property whose use is related to the religious entity's fulfillment of the owner's religious mission but is not used for profit-making purposes. It is true that this could include rental property as some religious entities provide housing for teachers, nurses, students, and other personnel of their affiliated noncommercial operations. It is true also that noncommercial property could include a warehouseone used to store food or clothing for charitable distribution, ft might include a gymnasium, school, hospital, senior citizens home, or agricultural property used to provide rehabilitative employment and food used for religious and charitable purposes. The descriptive term used by the Legislature is appropriate to all of these uses.

While the dissent expresses concern that the exemption on its face is overbroad and may be abused, this case does not present any issue regarding an exemption that is claimed for any reason other than enabling the religious entity to use the property to better fulfill its religious mission.
[7] Reversing Renzi v. Connelly School of the Holy Child (D.Md.1999) 61 F.Supp.2d 440, on which the dissent nonetheless relies.
[8] The exception found in subdivision (2) of section 3 of article XVI continues the authorization for aid to orphanages operated by religiously affiliated entities, providing: "The Legislature shall have the power to grant aid to the institutions conducted for the support and maintenance of minor orphans, or halforphans, or abandoned children, or children of a father who is incapacitated for gainful work by permanent physical disability or is suffering from tuberculosis in such a stage that he cannot pursue a gainful occupation, or aged persons in indigent circumstances such aid to be granted by a uniform rule, and proportioned to the number of inmates of such respective institutions."
[1] Although I believe that we should review Government Code sections 25373 and 37361 solely under the state constitutional provisions, I note my disagreement with the majority's federal constitutional analysis. In my view, for the reasons stated in the text, the statutes fail to survive scrutiny under Lemon v. Kurtzman, supra, 403 U.S. 602, 91 S.Ct. 2105.
[1] Because I conclude the law fails scrutiny under the United States Constitution, I need not discuss the religion clauses of the California Constitution. If required to address the question, however, I would construe our own establishment and no-preference clauses (Cal. Const., art. I, § 4) as barring preferential government advancement and promotion of religious missions at least to the same extent as I believe the federal establishment clause bars such preference.
[2] In Smith, the high court disavowed the balancing test it had sometimes applied to adjudicate religious freedom challenges to generally applicable laws, holding instead that, in general, the free exercise clause does not require government to grant exemptions for religiously motivated conduct from neutral, generally applicable laws. (Smith, supra, 494 U.S. at pp. 883-888, 110 S.Ct. 1595.)
[3] (See also St. Bartholomew's Church v. City of New York (2d Cir.1990) 914 F.2d 348, 353-356 [where landmarking prevented church from replacing its midtown Manhattan community house with commercial office tower, but did not prevent continuation of religious programs in the current community house, loss of economic opportunity, though large, was not an unconstitutional burden]; Christian Gospel Church v. San Francisco (9th Cir. 1990) 896 F.2d 1221, 1224 [preceding Smith: burdens caused by denial of conditional use permit for church wishing to locate in residential zone "minimal" ones of "convenience and expense," where church made no showing that worshiping in the particular home at issue was important]; Lucas Valley Homeowners Assn. v. County of Marin (1991) 233 Cal.App.3d 130, 143-147. 284 Cal.Rptr. 427 [applying pre-Smith law: Orthodox Jewish congregation not constitutionally entitled to exemption from zoning ordinance requiring special use permit for a house of worship in a residential area, though application of ordinance would make practice of its religion more onerous].)

Even the Supreme Court of Washington, which has construed both the First Amendment and the free exercise clause of its own state Constitution so as to give maximum protection to religious exercise, has acknowledged that not all financial burdens created by neutral land use laws pose a significant threat to free exercise. (Compare Open Door Baptist Church v. Clark County (2000) 140 Wash.2d 143, 995 P.2d 33, 42-43 [application fee for conditional use permit, estimated at more than $5,000, is not a cognizable burden without a showing of inability to pay] with First Covenant Church v. Seattle (1992) 120 Wash.2d 203, 840 P.2d 174, 183 [financial cost an unconstitutional burden only if "too gross"; landmark restrictions reducing church building's value by half is impermissible burden].)
[4] (See, e.g., Swaggart Ministries v. Cal. Bd. of Equalization (1990) 493 U.S. 378, 391, 110 S.Ct. 688, 107 L.Ed.2d 796 [application of sales lax to religious publications did not burden evangelical organization in a constitutionally significant manner, though it imposed an economic cost; "such a tax is no different from other generally applicable laws and regulations-such as health and safety regulations to which appellant must adhere"]; Hernandez, v. Commissioner (1989) 490 U.S. 680, 699, 109 S.Ct. 2136, 104 L.Ed.2d 766 [expressing doubt whether disallowance of tax deduction for purchase of religious training and counseling from Church of Scientology imposed substantial burden: at most, disallowance meant "adherents have less money available to gain access to such sessions"]; Bob Jones University v. United States (1983) 461 U.S. 574, 603-604, 103 S.Ct. 2017, 76 L.Ed.2d 157 ["Denial of tax benefits will inevitably have a substantial impact on the operation of private religious schools, but will not prevent those schools from observing their religious tenets"]; see also Smith v. Fair Employment & Housing Com. (1996) 12 Cal.4th 1143, 1172-1173, 51 Cal.Rptr.2d 700, 913 P.2d 909 [that landlord with religious objection against renting to unmarried couples might incur some cost in shifting from residential real estate to other investments does not, even under preSmith law, support her claim of constitutional entitlement to exemption from marital status discrimination bar].)
[5] A dictum in Smith, upon which the majority relies, is not authority for the constitutionality of all legislative measures labelled as accommodations of religion. Though Smith alluded with apparent equanimity to the prospect of "leaving accommodation to the political process" (Smith, supra, 494 U.S. at p. 890, 110 S.Ct. 1595), the court was considering only the free exercise question of whether exemptions from generally applicable law are constitutionally required; no establishment clause question was decided or discussed in Smith. Moreover, even if the Smith court's dictum were taken as a suggestion that legislative accommodation would be permissible under the establishment clause, it would say nothing about cases where the general law imposes no significant burden on religious practice, since the law at issue in Smitha criminal prohibition on the use of certain drugsclearly placed a substantial burden on the claimants' sacramental use of peyole.
[6] The majority opinion (ante, 102 Cal.Rptr.2d at p. 294, 13P.3d at p. 1135) asserts that I fault the optional (self-exemption) character of the statutes "even though the Legislature could have simply exempted the property." (Italics added.) Needless to say, I disagree that "the Legislature could have simply exempted the property." A blanket exclusion would suffer from the same types of non-neutrality as the present self-exemption provisions.
[7] The majority opinion, citing a letter to a legislative committee from then San Francisco Mayor Frank Jordan, as well as a letter to the Governor from the city's future mayor, Willie L. Brown, Jr., leaves the impression the City and County of San Francisco officially supported Assembly Bill No. 133. (Maj. opn., ante, 102 Cal.Rptr.2d at pp. 292-293, fn. 5, 13 P.3d at pp. 1133-1134.) In fact, the San Francisco Board of Supervisors adopted, and Mayor Jordan signed, a resolution opposing the legislation on the ground that it would permanently preempt the city's ability to protect its historic resources, protection that "contributes to the economic vitality of the City by maintaining a City that is unusual in its beauty and attractive to tourists." (S.F. Res. No. 887-93 (Nov. 12, 1993).) On June 23, 1994, the city's Director of Intergovernmental Affairs sent the resolution to Marian Bergeson, Chair of the Senate Committee on Local Government, with a letter urging her opposition to Assembly Bill No. 133.
[8] Relying on anecdotal evidence in Speaker of the Assembly Brown's letter to the Governor, the majority suggests that religious organizations in San Francisco "were faced with very high seismic retrofit costs for older buildings that had been or were subject to landmark designation but could not qualify for assistance from the Federal Emergency Management Agency (FEMA)." (Maj. opn., ante, 102 Cal.Rptr.2d at pp. 292-293, fn. 5, 13 P.3d at pp. 1133-1134.) Without disputing that religious groups may sometimes face special barriers to renovating or retrofitting their facilities, perhaps justifying individual hardship exemptions from landmark laws, I note that FEMA regulations appear to contain no general prohibition on religiously affiliated organizations receiving disaster assistance; although houses of worship do not seem to fall within the definition of an eligible "private nonprofit facility" (44 C.F.R. § 206.221(e) (2000)), hospitals, daycare and senior citizen centers, homeless shelters, schools and similar institutions operated by religiously affiliated organizations appear eligible so long as their facilities are open to the general public (id., § 206.22 l(e)(4)-(6)) and, in the case of schools, are not "used primarily for religious purposes or instruction" (id., § 206.221(e)(1)). I further observe that San Francisco's Landmarks Preservation Advisory Board, writing legislators to oppose Assembly Bill No. 133, pledged "to continue to work with religious leaders to find solutions to address State imposed mandates to seismically retrofit Unreinforced Masonry Buildings (UMB's) including finding potential sources of funding such as bonds, loans and grants to repair and maintain religious properties." (S.F. Landmarks Preservation Advisory Bd., letter to Sen. Bergeson, June 27, 1994.) The Advisory Board President also wrote separately to Senator Bergeson, pointing out that of the nine churches proposed by the Catholic Archdiocese for closure, only two were UMB's, and these two were already landmarked and hence unaffected by the proposed legislation. (Patrick McGrew, Pres., S.F. Landmarks Preservation Advisory Bd., letter to Sen. Bergeson, June 28, 1994.) If seismic retrofit of San Francisco's older religious buildings was the problem before the Legislature, Assembly Bill No. 133 was a grossly overbroad approach to a solution.
[9] (See Lucas Valley Homeowners Assn. v. County of Marin, supra, 233 Cal.App.3d at pp. 149-151, 284 Cal.Rptr. 427 [placement of conditions on congregation's use permit did not entangle county with religion, as the conditions were "concerned with mundane matters such as numbers, hours, location and noise restrictions," and did not call for the county to "divin[e] religious content or otherwise pass[ ] on the religious affairs of Chabad"]; Renzi v. Connelly School of Holy Child (D.Md.1999) 61 F.Supp.2d 440, 446, revd. suh nom. Ehlers-Renzi v. Connelly School of the Holy Child, Inc. (4th Cir.2000) 224 F.3d 283 [no substantial government interference with religion would be threatened by requiring religious school to obtain permit for operation in residential area, as permit process "would merely subject its use of the property to such basic zoning considerations as constructing facilities generally harmonious with the neighborhood and preventing excess traffic congestion"]; cf. Hernandez v. Commissioner, supra, 490 U.S. at pp. 697-698, 109 S.Ct. 2136 [Internal Revenue Service's administration of charitable contribution deduction does not create impermissible entanglement because it does not require government to determine value of religious services, though it does require religious institutions to disclose cost information to the IRS].)
[10] That plaintiffs have challenged sections 25373(d) and 37361(c) on their face rather than in any particular application does not reduce the force of this overbreadth analysis. That a law designed to favor religious adherents with unjustified assistance may in some cases be applied in a neutral manner does not alleviate the law's destructive effect, prohibited under the establishment clause, of conveying endorsement by differentially advancing religious causes over nonreligious ones. (See Santa Fe Independent School Dist. v. Doe, supra, 530 U.S. at p. ___, 120 S.Ct. at p. 2281 [upholding facial challenge to school district's policy sponsoring invocations at football games, despite possibility some invocations would be nonreligious, finding constitutional violation in "the mere passage by the District of a policy that has the purpose and perception of government establishment of religion"].)
[11] (See Mitchell v. Helms, supra, 530 U.S. at pp. 809-810, 120 S.Ct. at p. 2541 (plur. opn. of Thomas, J.) ["[I]f the government, seeking to further some legitimate secular purpose, offers aid on the same terms, without regard to religion, to all who adequately further that purpose, then it is fair to say that any aid going to a religious recipient only has the effect of furthering that secular purpose"]; id. at p. 838, 120 S.Ct. at p. 2557 (cone. opn. of O'Connor, J.) ["I do not quarrel with the plurality's recognition that neutrality is an important reason for upholding govern-mentaid programs against Establishment Clause challenges. Our cases have described neutrality in precisely this manner, and we have emphasized a program's neutrality repeatedly in our decisions approving various forms of school aid"]; id. at p. 883, 120 S.Ct. at pp. 2580-2581 (dis. opn. of Souter, J.) ["There is, of course, good reason for considering the gener
ality of aid and the evenhandedness of its distribution in making close calls between benefits that in purpose or effect support a school's religious mission and those that do not. . . . [T]he breadth of evenhanded distribution is one pointer toward the law's purpose, since on the face of it aid distributed generally and without a religious criterion is less likely to be meant to aid religion than a benefit going only to religious institutions or people"].)
[12] A split panel of the Fourth Circuit Court of Appeals recently reversed Renzi. (Ehlers-Renzi v. Connelly School of the Holy Child, Inc., supra, 224 F.3d 283.) I agree with the dissenting judge in that case that the majority, in upholding the preferential treatment as an accommodation of religious freedom despite the lack of a showing of significant burden, was "inappropriately expanding the [Corporation of Presiding Bishop ] principle and, as a result, traveling down a path that will ultimately render the Establishment Clause meaningless." (Id. at p. 293 (dis. opn. of Murnaghan, J.).)
[13] Nothing in the record or briefing indicates that landmark regulation imposes costs only or primarily on religious property owners. Religious properties comprise only 1.2 percent of landmarks in New York City, 1.1 percent in Philadelphia (Weinstein, supra, 65 Temp. L.Rev. at pp. 111-112), and approximately 12.5 percent in San Francisco. Other charitable, educational, cultural and civic organizations must bear the incidental costs of landmark designation, such as application costs and delays, the increased expense of repairing, rehabilitating and expanding their properties in a historically appropriate manner, and the opportunity cost of forgoing commercial development of landmarked noncommercial buildings occupying prime commercial real estate. In some instances, to be sure, religious property owners may face unique problemssuch as the desire to change liturgically significant features, or disqualification from participating in government-funded rehabilitation programs. As discussed in the previous part, however, sections 25373(d) and 37361(c) were not designed to alleviate any such unique burdens, but to grant a blanket power of self-exemption from landmark laws.